# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

NEONATAL PRODUCT GROUP, INC.,

       Plaintiff/Counterclaim
       Defendant,

v.

JANICE M. SHIELDS,
PAUL W. SHIELDS, and ANGELE
INNOVATIONS, LLC,

       Defendants/Counterclaimants,

v.

CRECHE INNOVATIONS, LLC,
MILLENNIUM MARKETING
GROUP, LTD., and
SCOTT A. NORMAN,

       Counterclaim Defendants.

Case No. 13-2601-DDC-KGS

---

## MEMORANDUM AND ORDER

    This is a patent infringement dispute.  On November 25, 2013, plaintiff Neonatal Product

Group, Inc. ("Neonatal"), doing business as Creche Innovations, LLC ("Creche") filed this

lawsuit against Janice M. Shields and Paul W. Shields, individually and as trustees of the Shields

Family Trust, and Angele Innovations, LLC (collectively, "the Shields Defendants").  Doc. 1.

Neonatal seeks:  (1) a declaratory judgment that Neonatal has not infringed U.S. Patent No.

6,417,498 ("the '498 Patent"); and (2) a declaratory judgment that the Asserted Claims of the

'498 Patent are invalid.  Doc. 49 ¶¶ 36–41; Doc. 143 at 19.

    The device disclosed in the '498 Patent is called the "Neonatal Substrate Warmer."  The

device automatically warms and vibrates baby bottles containing frozen or refrigerated breast

milk so that the milk thaws, warms, and mixes quickly and efficiently.  Defendants Janice M. Shields and Paul W. Shields invented the Neonatal Substrate Warmer and procured the '498 Patent.  Defendant Angele Innovations, LLC currently owns the '498 Patent.

The Shields Defendants responded to the lawsuit by filing an Answer and Counterclaim (Doc. 30).  It asserted eight counterclaims against four counterclaim defendants:  Neonatal, Creche, Millennium Marketing Group, Ltd., and Scott Norman (collectively, "the Counterclaim Defendants").  The eight counterclaims asserted against the Counterclaim Defendants include: (1) patent infringement; (2) inducement of patent infringement; (3) breach of an Exclusive License Agreement; (4) breach of a Patent Marketing Agreement; (5) tortious interference with contract; (6) breach of fiduciary duty; (7) intentionally causing or assisting agent to violate duty of loyalty; and (8) unjust enrichment.  Doc. 143 at 20, ¶ 4(c) (Pretrial Order).

Neonatal and the Counterclaim Defendants[1] have filed a Motion for Partial Summary Judgment.  Doc. 118.  They seek summary judgment in favor of Neonatal's claim for a declaratory judgment of non-infringement.  They also seek summary judgment against five of the Shields Defendants' counterclaims.  For the reasons explained below, the court grants Neonatal's Motion for Partial Summary Judgment.

## I.    Motions to Strike

Before considering the Motion for Partial Summary Judgment, the court addresses the motions to strike filed by each party.

### A.  Neonatal's Motion to Strike

Neonatal has filed a Motion to Strike.  Doc. 140.  It asks the court to strike certain paragraphs of the Declaration of Drake L. Koch (Doc. 133-3) submitted by the Shields Defendants in their Opposition to the Motion for Partial Summary Judgment.  It also asks the

---

[1]    Going forward, the court refers to the four Counterclaim Defendants collectively as Neonatal.

court to strike certain paragraphs from the Shields Defendants' Opposition to the Motion for Partial Summary Judgment—paragraphs that are based on the portions of Mr. Koch's Declaration that, Neonatal contends, are improper.

Neonatal asserts that the court should strike this material because it contains new infringement contentions that contradict and depart from the infringement contentions asserted by the Shields Defendants. Neonatal contends that the Shields Defendants have argued, improperly, in their Opposition to the Motion for Partial Summary Judgment that the alleged infringing product contains a "heater block" consisting of both the outer metal shell of the warmer and the orange foam insulation blanket wrapped around the cups of the warmer. But, in their infringement contentions, the Shields Defendants asserted that the heater block consists only of the foam insulation blanket.

On February 18, 2015, the court entered a Scheduling Order (Doc. 40) governing the first phase of discovery and establishing certain deadlines. One of the deadlines required the parties to disclose asserted claim and infringement contentions by May 1, 2015. Doc. 40 at 2. Consistent with the Scheduling Order, the Shields Defendants served their Disclosures of Asserted Claims and Infringement Contentions on May 1, 2015. Doc. 119-5 at 9–10. It identified the "heater block" in a claim chart in two different sections. *See* Doc. 119-5 at 2–3 (§§ 1.a., 10.a.). Section 1.a. recites: "The Penguin Single includes a heater block comprising at least one void therein. Ex. A, 7–9, Claim 1.a." *Id.* at 2 (§1.a.). Section 10.a. states: "The Penguin Single includes a heater block comprising at least one well therein; Ex. A, 7–9, Claim 10.a." *Id.* at 3 (§ 10.a.). The illustrations referenced in the claims identify only the foam insulation blanket. *Id.* at 14–15 (illustrations 7–9).

The Scheduling Order also provides that "[e]ach party's 'Infringement Contentions' and 'Invalidity Contentions' shall be deemed to be that party's final contentions." Doc. 40 at 11. The Scheduling Order permitted the parties to amend their infringement contentions in two ways. *Id.* at 11–12. First, the Scheduling Order allows amendment without leave of court within 30 days after the court issues its Claim Construction Order. *Id.* at 11. Second, the Scheduling Order allows the Shields Defendants to move for leave to amend or supplement their infringement contentions outside the 30-day window on a showing of good cause. *Id.* at 12. The Shields Defendants never amended their infringement contentions within the 30 days following the court issuing its Claim Construction Order. Also, the Shields Defendants never moved the court for leave to amend their infringement contentions.

Neonatal argues that the court should strike certain portions of Mr. Koch's Declaration and the Shields Defendants' Opposition because they contradict the asserted infringement contentions. For support, Neonatal relies on a Federal Circuit case that affirmed summary judgment against a patent infringement claim. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1367–70 (Fed. Cir. 2006). The case originated in the Northern District of California. *Id.* at 1358. That court's local rules for patent cases imposed requirements for serving and amending infringement contentions, similar to the requirements imposed by the Scheduling Order in this case. *Id.* at 1262–63. The plaintiff filed its infringement contentions as the local rules required. *Id.* at 1360. Later, the plaintiff moved for leave to amend its infringement contentions, but did so more than six months after the district court had issued its claim construction ruling and more than three months after an expert's deposition that revealed the new facts supporting the amendment. *Id.* at 1361. The district court denied the motion for leave to amend because plaintiff had delayed filing the motion and this delay, the court

concluded, amounted to a lack of diligence. *Id.* at 1361–62. The plaintiff also moved for leave to supplement its expert reports to include the amended contentions. *Id.* at 1362. The district court denied that motion as well. *Id.*

The Federal Circuit affirmed both rulings. *Id.* at 1366–69. It described the local patent rules as "essentially a series of case management orders." *Id.* at 1363. And, it recognized that the rules were "designed specifically to 'require parties to crystallize their theories of the case early in the litigation' so as to 'prevent the "shifting sands" approach to claim construction.'" *Id.* at 1364 (quoting *Atmel Corp. v. Info. Storage Devices, Inc.*, No. C 95-1987 FMS, 1998 WL 775115, at *2 (N.D. Cal. 1998)). The Circuit also concluded that "[i]f the parties were not required to amend their contentions promptly after discovering new information, the contentions requirement would be virtually meaningless as a mechanism for shaping the conduct of discovery and trial preparation." *Id.* at 1366. The Circuit thus held that the local patent rules were valid and consistent with the Federal Rules. *Id.* at 1366.

The Federal Circuit also concluded that the district court had not abused its discretion by denying the plaintiff's motions for leave to amend and to supplement its expert report because plaintiff had delayed and otherwise acted with a lack of diligence. *Id.* at 1367–69. The Circuit recognized that "the exclusion of evidence is often an appropriate sanction for the failure to comply with [disclosure] deadlines." *Id.* at 1369 (citations omitted). And, the Circuit found "no abuse of discretion in this case, given the significance of the omitted material and [the plaintiff's] lack of diligence." *Id.*

Neonatal urges the court to follow the Federal Circuit's reasoning in *O2 Micro*.[2] Similar to the plaintiff in that case, the Shields Defendants here failed to assert a newly discovered

---

[2] The Shields Defendants assert that *O2 Micro* is not binding on this court because it involves the Federal Circuit's interpretation of the local rules from the Northern District of California. Doc. 147 at 5

infringement contention in their required disclosures. But, unlike the *O2 Micro* plaintiff, the Shields Defendants never have sought leave to amend their infringement contentions to include their new infringement theory. Instead, they simply have asserted the new contentions in their Opposition to Neonatal's Motion for Partial Summary Judgment. This violates the court's Scheduling Order.

In their Opposition, the Shields Defendants argue that Neonatal has been well aware of this theory because they asserted it over a year ago in their claim construction brief. The Shields Defendants contend that their proposed construction of "heater block" as a "housing assembly" placed Neonatal on notice that they were contending that the alleged infringing product contains a "heater block" consisting of *both* the outer metal shell of the warmer and the orange foam insulation blanket. Even if the court could find that this proposed claim construction—one that the court ultimately rejected in its claim construction ruling—had placed Neonatal on notice of the Shields Defendants' summary judgment argument, the Shields Defendants still failed to disclose it as one of their infringement contentions. And, the Shields Defendants cannot circumvent their obligation to identify their infringement contentions by relying on a failed proposed claim construction. Indeed, as Neonatal explains, the claim construction process and the infringement analysis are two separate, distinct parts of a patent case. The claim construction

---

n.4. The court disagrees. "[A] procedural issue that is not itself a substantive patent law issue is nonetheless governed by Federal Circuit law if the issue pertains to patent law, if it bears an essential relationship to matters committed to our exclusive control by statute, or if it clearly implicates the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction." *O2 Micro Int'l Ltd.*, 467 F.3d at 1364; *see also Sprint Commc'ns Co. L.P. v. Comcast Cable Commc'ns, LLC* , Nos. 11-2684-JWL, 11-2685-JWL, 11-2686-JWL, 2015 WL 11121849, at *1 n.5 (D. Kan. May 12, 2015) ("The law of the Federal Circuit, rather than the Tenth Circuit, governs this particular discovery dispute which is unique to patent law."). Here, the dispute involves a procedure pertaining only to patent law—the timely disclosure of infringement contentions. Thus, Federal Circuit law governs the dispute. And, although *O2 Micro* involved another district court's local rules, those local rules contained requirements for disclosing and amending infringement contentions that are virtually identical to the ones contained in the court's Scheduling Order in this case.

process is a question of law that requires the court to "constru[e] the patent" while the infringement analysis is a question of fact requiring a "determin[ation] whether infringement occurred." *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 384 (1996) (citations omitted).

The Shields Defendants never dispute that their infringement contentions never disclosed this theory. To the contrary, their infringement contentions only identify the "heater block" as the foam insulation blanket. *See* Doc. 119-5 at 2–3, 14–15 (illustrations 7–9). Thus, the Shields Defendants' attempt to assert a new infringement contention violates the court's Scheduling Order establishing deadlines for disclosing and amending infringement contentions.

The Federal Rules of Civil Procedure authorize the court to impose any just sanction for a party's "fail[ure] to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). Such sanctions may include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii). Here, the Shields Defendants have attempted to introduce a new infringement theory in response to Neonatal's Motion for Partial Summary Judgment—one that they never asserted in their infringement contentions, as the Scheduling Order required them to do. The court thus grants Neonatal's Motion to Strike (Doc. 140), and strikes the portions of Mr. Koch's Declaration and the Shields Defendants' Opposition to the Motion for Partial Summary Judgment improperly changing their infringement contention that the "heater block" consists only of the foam insulation blanket.

### B. The Shields Defendants' Motion to Strike

The Shields Defendants also have filed a Motion to Strike. Doc. 151. It seeks to strike certain undisputed facts and arguments asserted in Neonatal's Memorandum in Support of the Motion for Partial Summary Judgment. Doc. 119. Neonatal filed the Memorandum on October

4, 2016.  The Shields Defendants filed their Opposition on November 23, 2016.  Doc. 133.  In some instances, the Opposition already raised the arguments that the Shields Defendants now assert in their Motion to Strike.  In other instances, the Opposition never raised these arguments.  Instead, the Shields Defendants waited to assert the omitted arguments until filing the Motion to Strike on January 27, 2017 (Doc. 51)—more than one month after the briefing closed on the Motion for Partial Summary Judgment.

Neonatal argues that the Shields Defendants asserted these arguments in an untimely fashion and, in effect, filed an unauthorized surreply to the summary judgment motion.  The court agrees.  The Shields Defendants already asserted some of these arguments and easily could have asserted the others in their Opposition to the Motion for Partial Summary Judgment.  But, they waited until after the briefing closed to present them—some for a second time—in the Motion to Strike.

Nevertheless, even if the court considered all the arguments advanced by the Shields Defendants' Motion to Strike, the arguments are meritless.  The Shields Defendants ask the court to strike portions of Neonatal's Memorandum because, they contend, certain facts and argument are irrelevant, misleading, and improper.  But, the court only considers material facts on summary judgment.  *See* Fed. R. Civ. P. 56 ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any *material* fact and the movant is entitled to judgment as a matter of law" (emphasis added)).  And, in the Uncontroverted Facts recited below, the court has included only those facts that it concludes are material.

The Shields Defendants also ask the court to strike portions of Neonatal's Memorandum that raise accord and satisfaction as an affirmative defense.  The Shields Defendants assert that Neonatal never preserved this affirmative defense in any of their Answers, and thus Neonatal

improperly raised the defense on summary judgment. The Shields Defendants already asserted this argument in their Opposition to the Motion for Partial Summary Judgment. Doc. 133 at 27–29. The court considers this argument and the Shields Defendants' response to it in the summary judgment analysis below. The court finds there was no reason to multiply the parties' litigation efforts or to inflate the number of motions the court must decide. The Shields Defendants did not need to file a motion to strike the material from the Memorandum. For these reasons, the court denies the Shields Defendants' Motion to Strike (Doc. 151).

## II. Motions for Summary Judgment

The court now turns to consider Neonatal's Motion for Partial Summary Judgment. Doc. 118.

### A. Uncontroverted Facts

The following facts are either stipulated facts taken from the Pretrial Order (Doc. 144), uncontroverted, or, where controverted, stated in the light most favorable to the Shields Defendants, the parties opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The '498 Patent, entitled "Neonatal Substrate Warmer," was filed on April 12, 2001, and issued on July 9, 2002. Janice M. Shields and Paul W. Shields are listed as inventors of the '498 Patent. On August 19, 2010, Mr. and Ms. Shields transferred ownership of the '498 Patent to the Shields Family Trust Dated August 19, 2010 ("the Trust").

On June 1, 2006, Mr. and Mrs. Shields entered into an Exclusive License Agreement with Neonatal. Under the Exclusive License Agreement, the Shields Defendants granted Neonatal an exclusive license in the '498 Patent in exchange for ongoing royalty payments and other consideration. In early 2013, Neonatal stopped making timely royalty payments under the

Exclusive License Agreement. So, on May 23, 2013, Mr. and Mrs. Shields terminated the Exclusive License Agreement.

When the parties signed the Exclusive License Agreement, Neonatal believed that two of its products—PENGUIN® milk-warming machines and THERMA-LINER™ bags—used the '498 Patent. But, in mid-2013, Neonatal concluded that the '498 Patent did not actually cover its PENGUIN® machines and THERMA-LINER™ bags.

On September 27, 2013, Neonatal and Mr. and Mrs. Shields entered into a Letter of Intent. With this Letter of Intent, they resolved their dispute about contested royalties under the terminated Exclusive License Agreement. They also agreed in the Letter of Intent to negotiate in good faith to try to agree to a new license agreement that would include Mr. and Mrs. Shields' pending patent applications. Section 3.a. of this Letter of Intent required Neonatal to make a wire-transfer payment to Mr. and Mrs. Shields on the day when the Letter of Intent was signed as full payment for the 2013 1st Quarter royalties due under the terminated Exclusive License Agreement. Neonatal made and Mr. and Mrs. Shields accepted the wire-transfer payment, as required by section 3.a. of the Letter of Intent. Section 3.b. of the Letter of Intent required Neonatal to make a second wire-transfer payment to Mr. and Mrs. Shields within 30 days of the Letter of Intent's execution (provided Mr. and Mrs. Shields disclosed certain intellectual property specified in the Letter of Intent) as full payment for the portion of the 2013 2nd Quarter royalties due under the terminated Exclusive License Agreement for product sales made before the termination date of May 23, 2013. Neonatal made and Mr. and Mrs. Shields accepted the wire-transfer payment, as required by section 3.b. of the Letter of Intent. Section 3.c. of the Letter of Intent provides: "The parties acknowledge that no other royalty payments are due under the terminated Exclusive License Agreement for product sales made prior to the May 23,

2013 termination." Doc. 120-2 at 2. Section 5.d. of the Exclusive License Agreement provides:

"If the New License Agreement is not executed, [Neonatal] is not obligated to pay any royalties

pursuant to the Exclusive License Agreement for any product sales that occurred after May 23,

2013, but neither party will have waived any rights it had with respect to any obligations that

survived the termination of the Exclusive License Agreement, including Licensors' right to sue

Licensees for patent infringement." *Id.* Neonatal and Mr. and Mrs. Shields were unable to agree

on the terms of a new License Agreement.

### The Asserted Claims of the '498 Patent

Independent claim 1 of the '498 Patent reads:[3]

A heating device comprising:

a **heater block** comprising at least one **void** therein;

at least one **removable reservoir** disposed within said at least one **void** of said **heater block**; and

means for heating said at least one **removable reservoir**, said means for heating being disposed between said at least one **removable reservoir** and said **heater block** within each said at least one **void**.

Doc. 1-1 at 8 (col. 6 ll. 46–53). Claims 2–7 and claim 9 "depend from" claim 1, and each of

those claims incorporates all limitations of claim 1. Independent claim 10 of the '498 Patent

reads:

A liquid container heating device for a liquid to a desired temperature, said liquid container heating device using heat exchange of a heating fluid with a container, said liquid container heating device comprising:

a **heater block** comprising at least one **well** therein;

at least one **removable reservoir** for receiving said heating fluid, said at least one **removable reservoir** being disposed within said at least **well** of said **heater block**; and

---

[3]    The court has bolded the terms that are relevant to this Motion for Partial Summary Judgment.

at least one heating element for heating said heating fluid, said at least one heating element being disposed between said at least one **removable reservoir** and said at least one **well** of said **heater block**;

wherein said container is placed in said heating fluid, said at least one **removable reservoir**, said at least one heating element heats said at least one **removable reservoir** and said heating fluid, and said heating fluid in turn heats said container, whereby said liquid within said container rendered suitably heated for use.

Doc. 1-1 at 9 (col. 7 ll. 13–30). Claims 11, 13, 14, 16, and 17 "depend from" claim 10, and each of those claims incorporates all limitations of claim 10.

### The Court's Claim Construction

On May 3, 2016, the court issued a Memorandum and Order construing the claim terms. Doc. 101. The court construed "heater block" as "a solid piece of material, having at least one flat side." *Id.* at 11. The court construed "removable reservoir" as "a liquid-holding receptacle designed to be removed." *Id.* at 19. The court construed "void" as "an empty space formed in the heater block." *Id.* at 14. The court construed "well" as "a shaft formed in the heater block." *Id.* at 15.

### The Shields Defendants' Infringement Contentions

The Shields Defendants served their Disclosures of Asserted Claims and Infringement Contentions ("Disclosures") on May 1, 2015. Doc. 119-5. These Disclosures contend that the limitations "removable reservoir," "heater block," "void," and "well" are literally present in the Accused Products. *Id.* at 7 (§ 4.a.). The Disclosures do not contend that the limitations "removable reservoir," "heater block," "void," and "well" are present in the Accused Products under the doctrine of equivalents. *Id.* (§ 4.b.). The Shields Defendants never have amended their Disclosures as a matter of right and never have moved for leave to amend their Disclosures.

***The Accused Products***

In 2006, Millennium Marketing Group asked Drake Koch to design a milk warmer based on the '498 Patent. Mr. Koch is the designer responsible for the commercial design and manufacture of what became known as the single-bottle PENGUIN® warmer and the four-bottle PENGUIN® warmer. Mr. Koch also designed the original liner bag for the warmer, which later became known as the THERMA-LINER® bag.

Both types of PENGUIN® warmers have an outer metal shell with seven flat sides. The metal shell is made from stainless steel. The metal shell is rigid, and it supports the other components of the PENGUIN® warmer.

Neonatal's single-bottle PENGUIN® warmer includes a single cup located on the top of the unit that is designed to receive THERMA-LINER® bags when the warmer is in use. A photograph portrays a single-bottle PENGUIN® warmer as follows:



Doc. 119-2 at 2, ¶¶ 5–6. Neonatal's four-bottle PENGUIN® warmer includes four cups located on the top of the unit that are designed to receive THERMA-LINER® bags when the warmer is in use. A photograph portrays a four-bottle PENGUIN® warmer as follows:



*Id.* at 3, ¶¶ 7–8. The Shields Defendants contend that the cups of the single-bottle and four-bottle PENGUIN® warmers constitute the "removable reservoir" in the Asserted Claims. Doc. 119-5 at 2–3 (§§ 1.b., 10.b.), *id.* at 11–13, 16 (illustrations 1–5, 11).

Neonatal's single-bottle and four-bottle PENGUIN® warmers include insulation blankets inside the units that are wrapped around the cups of the warmers. This insulation blanket is a spongy, pliable material that is wrapped around the exterior of each cup in a PENGUIN® single-bottle or four-bottle machine. The Shields Defendants' infringement contentions identify each insulation blanket surrounding the cups as the "heater block." *See* Doc. 119-5 at 2–3 (§§ 1.a., 10.a.), *id.* at 14–15 (illustrations 7–9).

The case of each single-bottle and four-bottle PENGUIN® warmer is hollow and contains some empty space. The hollow interior of a single-bottle PENGUIN® warmer case with the top cover removed is depicted in the picture below. Mr. Koch designed the warmers to include this empty space.



Doc. 119-2 at 6, ¶ 16.   As shown above, the interior space of the case contains the warmer's

components, but it is otherwise unfilled.  Neonatal's Vice President Mark A. Petheram opines

that:  "If one were to knock on the exterior of the case, one could easily determine that it is

hollow, not a solid block."  *Id.* at 5, ¶ 15.

The PENGUIN® warmers' user manual never instructs a user to remove a cup from a

warmer.  Neonatal does not provide and never has provided any instructions to users explaining

how to remove a cup from a warmer.  Indeed, the user manual explains: "There are no

serviceable parts or calibration that can be performed by the user" on the warmers.  Doc. 119-3

at 11.  The user manual also includes the following warnings:

> **WARNING** - The equipment utilizes controlled overvoltage Equipment
> techniques that require the equipment to be grounded whenever normal mode or
> common mode AC voltages or transient voltages may occur.  The enclosure is
> grounded through the grounding conductor of the power cord.
>
> . . .
>
> **WARNING** - To avoid personal injury or death, ***do not remove the equipment
> cover.***

Do not operate the equipment without the cover(s) properly installed. Normal Calibration is accomplished with the cover closed, and there are no user-serviceable parts inside the equipment, so there is no need for the operator to ever remove the cover(s).

. . .

**WARNING** - Do not use the equipment in a manner not specified!

*Id.* at 12–13.

Neonatal does not recommend that a user ignore these warnings. But, Drake Koch asserts, he designed the warmer so that the cup is removed easily with commonly available hand tools. If a user chooses to ignore Neonatal's warnings and remove the cover of the case of a single-bottle PENGUIN® warmer, the user must remove six screws with an Allen wrench. Once the user has removed those six screws, the user must lift the top cover off the warmer, exposing the various components of the warmer attached to the exterior surface of the cup.



The above-picture shows what a user would see after opening the warmer. Doc. 119-2 at 10–11, ¶ 28. An orange foam insulation blanket covers the exterior of the cup. Mr. Koch asserts that he followed the teachings of the '498 Patent when he designed the warmers and used a synthetic cork insulative material formed from a piece of silicone sheet. Mr. Koch also designed the warmers with an insulative material that is molded to a desired shape by wrapping the

insulative material around the cup and joining the ends together with tape. The tape serves to secure the ends of the insulation blanket and to fit the insulation blanket snugly around the cup.

Mr. Koch explains that one can remove the cup from the warmer by removing four nuts that connect the cup to the metal shell and unplugging the wire connectors from the circuit board. The following picture shows the cup, removed by using Mr. Koch's method:



Doc. 133-3 at 7, ¶ 23. The picture below shows the top of the warmer with the cup removed. Mr. Koch designed the cup to fit into the circular hole located on the top of the warmer, as shown in this picture:



Doc. 133-3 at 12, ¶ 42.

Following Mr. Koch's removal method, the orange foam insulation blanket still remains on the outside of the cup. Other components (that are described below and shown in the above picture) remain as well. Mr. Koch asserts that a user can remove the cup from the warmer without removing the other components.

But, to remove the other components attached to the cup, one would start by removing the orange foam insulation blanket. The user can remove the insulation blanket from the exterior surface of the cup by cutting the black zip-tie holding it in place[4] and removing the tape that secures its ends together. Once removed, the insulation blanket is an uninterrupted piece of pliable material of consistent width. *See* Doc. 119-2 at 5, ¶¶ 13–14. After removing the insulation blanket, the user will see the heater blanket and thermistor. Adhesive secures the heater blanket to the exterior surface of the cup. And two pieces of heat-safe Kapton® polymide film tape secure the thermistor to the exterior surface of the cup. The photograph below shows the orange heater blanket, which is wrapped around, and adhesively secured to, the exterior surface of the cup:



Doc. 119-2 at 13, ¶ 33.

---

[4]    This black zip-tie is visible in the picture above on page 16.

Drake Koch designed the warmer with the thermistor so that one can set the warmer to a desired stabilized temperature. The thermistor is connected to a circuit board attached to outer shell of the warmer (shown in the upper left in the above picture). To remove the thermistor from the exterior surface of the cup, the user must remove the Kapton® tape securing the thermistor. If a user removes the thermistor from the exterior of the cup, Neonatal recommends not reusing it, but instead replacing it because Neonatal has found the accuracy and reliability of the thermistor to decrease if it is removed. Also, the Kapton® polymide film tape that secures the thermistor to the cup is one-time use tape. A user would have to replace the tape if he or she reassembled the unit.

To remove the heater blanket from the exterior surface of the cup, the user must either dissolve the adhesive securing the heater blanket to the cup, or rip off the heater blanket from the exterior surface of the cup. The latter option risks tearing the heater blanket. If the user removes the heater blanket, he or she would have to supply new adhesive to reattach it. Also, Neonatal recommends recalibration of the PENGUIN® warmer following reassembly. The heater blanket and thermistor cooperatively control the temperature of the warming unit (via programming logic). Recalibration of these components is necessary to ensure that the PENGUIN® warmer warms neonatal substrate to the proper temperature so that it will not burn or scald a NICU patient consuming the milk warmed by the unit. A user cannot perform this recalibration. Neonatal never would recommend using a PENGUIN® warmer after a user has removed and then reapplied the heater blanket or thermistor without first recalibrating the unit by Neonatal qualified personnel. Otherwise, severe risk of injury to a baby or user exists.

To continue removing the components attached to the cup, a user next must remove a weld securing an electrical grounding bracket to the exterior surface of the cup. The grounding

bracket is the metal bracket positioned above the orange heater blanket in the photograph below. Its center is where it is welded to the exterior surface of the cup.



Doc. 119-2 at 14–15, ¶ 39.

A grounding bracket is welded to the exterior surface of each cup and electrically connected to the cover and base of the PENGUIN® warmer to provide a common electrical ground for the unit. The purpose of grounding the cover and cup to the base of the PENGUIN® warmer is to prevent shock or electrocution when using a PENGUIN® warmer if the electrical insulation on the unit fails for some reason. This is one reason why the user manual warns users not to open the unit.

If a user removed the weld securing and electrically connecting the grounding bracket to the exterior surface of the cup, he or she would have to re-weld the bracket to the cup before reusing the warmer. If the weld does not provide sufficient electrical conduction, electrocution or shock may result. For this reason, Neonatal never would approve or certify use of a PENGUIN® warmer where a user has re-welded the ground bracket to the cup because an unsafe condition may exist that could produce electrocution and death.

A one-time-use zip-tie secures a damper to the exterior surface of the cup. The black zip-tie securing the damper to the exterior surface of the cup is shown in the photo below:



Doc. 119-2 at 16, ¶ 42. The zip-tie secures the damper to the exterior surface of the cup so that the damper can reduce relative movement of the cup in relation to the cover when the vibration function of the warmer is activated. If a user removed the damper zip-tie, the user would have to supply a new zip-tie to reattach the damper to the exterior surface of the cup.

To continue removing the components attached to the cup, a user next would have to remove the vibrating mechanism attached to the bottom of the cup. The following picture shows the vibrating mechanism attached to the bottom of the cup:



Doc. 119-2 at 17, ¶ 46.

Drake Koch designed the vibrating mechanism to be secured to the bottom of the cup by a polymer adhesive, allowing removal and replacement of the vibrating mechanism without damaging the vibrating mechanism, cup, or polymer adhesive. So, to remove the vibrating

mechanism, the user must tear off the bottom of the cup and remove the adhesive that secures it in place.

If a user successfully removed all of these components from a PENGUIN® warmer, the warmer no longer would work for its intended purpose. The user would have to reassemble the unit to make the warmer operable. If a user successfully removed these components from a PENGUIN® warmer and then reassembled the PENGUIN® warmer, Neonatal would not recommend or certify that PENGUIN® warmer for use for at least three reasons:

(1) the unit's temperature controls would need to be recalibrated by qualified Neonatal personnel to ensure the unit's warming function, which is provided by the heater blanket and monitored and controlled by the thermistor, operated properly such that the machine would suitably warm the milk without being so hot such that it could scald or burn a user or a baby and break down the warmed milk's nutrients;

(2) the unit's vibration controls would need to be recalibrated by qualified Neonatal personnel to ensure the unit's warming vibration operated properly so the milk warmed in the machine would not contain hot spots that could scald or burn a user or a baby and break down the warmed milk's nutrients; and

(3) proper grounding of the warmer's components, including the cover, cup, and base, would need to be verified to ensure a user could not be shocked or electrocuted when using a PENGUIN® warmer if the electrical insulation on the unit fails for some reason.

Doc. 119-2 at 17–18, ¶ 48.

Neonatal recommends that, if a user successfully removed these components from a PENGUIN® warmer and then reassembled the PENGUIN® warmer with other component parts, Neonatal personnel (or other trained biomedical technicians with the appropriate testing equipment) would need to service the unit to perform the required calibrations and verifications before a user operated the unit again. Also, if a user replaced any part of a PENGUIN® warmer,

Neonatal would require that the unit undergo quality and safety testing before placing the unit back in service, allowing the unit could maintain its safety certification.

***Mr. Norman's Relationship to Neonatal***

Counterclaim Defendant Scott A. Norman is the CEO of Neonatal. Mr. Norman has engaged actively in Neonatal's management. Mr. Norman knew the terms of the Exclusive License Agreement.

***The Parties' Agreement About Infringement***

The parties agree that, for purposes of an infringement analysis, the relevant structures and components of a single-bottle Original PENGUIN® Warmer are identical to the corresponding structures and components of a four-bottle Original PENGUIN® Warmer. The parties thus agree that if a single-bottle Original PENGUIN® Warmer is found to infringe the '498 Patent, a four-bottle Original PENGUIN® Warmer also infringes the '498 Patent, and *vice versa*. Also, the parties agree that if a single-bottle Original PENGUIN® Warmer is found not to infringe the '498 Patent, a four-bottle Original PENGUIN® Warmer also does not infringe the '498 Patent, and *vice versa*.

The parties agree that, for purposes of the infringement analysis, the relevant structures and components of a Deluxe PENGUIN® Warmer are identical to the corresponding structures and components of an Original PENGUIN® Warmer. The parties thus agree that if the Original PENGUIN® Warmers are found to infringe the '498 Patent, the Deluxe PENGUIN® Warmers also infringe the '498 Patent, and *vice versa*. Also, the parties agree that if the Original PENGUIN® Warmers are found not to infringe the '498 Patent, the Deluxe PENGUIN® Warmers also do not infringe the '498 Patent, and *vice versa*.

### B. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to

affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

In an action for patent infringement, the party asserting infringement bears "the burden of proving infringement by a preponderance of the evidence." *Kegel Co., Inc. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir. 1997). Thus, to survive Neonatal's summary judgment motion, the Shields Defendants must show that "the evidence is such that a reasonable jury could return a verdict for [them]." *Anderson*, 477 U.S. at 248.

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### C. Analysis

Neonatal seeks summary judgment on its claim for a declaratory judgment of non-infringement. Neonatal also moves for summary judgment against five of the Shields Defendants' counterclaims: (1) patent infringement (Count I); (2) inducement of patent infringement (Count II); (3) breach of an Exclusive License Agreement (Count III); (4) tortious interference with contract (Count V); and (5) unjust enrichment (Count VIII). The court addresses each claim, in turn, below.

### 1. Has Neonatal Infringed the '498 Patent?

Neonatal asserts that it has not infringed the '498 Patent because the Accused Products (the PENGUIN® milk-warming machines) lack all of the Asserted Claims' required limitations of a "heater block," a "removable reservoir," and either a "void" or a "well." The court determines whether an accused product infringes the claims of a patent using a two-step inquiry. *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1370 (Fed. Cir. 2007). In the first

step, the court construes the claims, as a matter of law, to determine their scope and meaning. *Id.*; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Here, the court construed the disputed claim terms in its May 3, 2016 Memorandum and Order. Doc. 101. So, having construed these claim limitations as a matter of law, the court proceeds to the second step of the infringement analysis.

In step two, the court compares the properly construed claims to the accused product. *Elbex Video, Ltd.*, 508 F.3d at 1370. The second step is the infringement determination, and it is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). "To prove infringement, the patentee must show that the accused device meets each claim limitation, either literally or under the doctrine of equivalents." *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005).

The Shields Defendants assert that Neonatal's PENGUIN® warmers literally infringe the '498 Patent.[5] "Literal infringement requires that each and every claim limitation be present in the accused product." *Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1378 (Fed. Cir. 2006). "Any deviation from the claim precludes . . . a finding [of literal infringement]." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001). Thus, a court properly may decide a "literal infringement issue . . . upon summary judgment when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Bai*, 160 F.3d at 1353; *see also TechSearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment is appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury.").

---

[5] The Shields Defendants never have contended that the limitations "heater block," "removable reservoir," "void," or "well" are infringed under the doctrine of equivalents. Doc. 119-5 at 7 (§ 4.b.). The Shields Defendants only allege literal infringement of these four limitations. *Id.* at 7 (§ 4.a.).

Applying this governing legal standard, the court considers whether each of the required limitations of a "heater block," a "removable reservoir," and either a "void" or a "well" is found in the Accused Products (the PENGUIN® milk-warming machines). If the Accused Products lack any one of these required limitations, the Shields Defendants' infringement claim fails as a matter of law.

### a. "Heater Block"

All of the Asserted Claims of the '498 Patent include "a heater block comprising at least one [void or well] therein." Doc. 1-1 at 8 (col. 6 ll. 47); Doc. 1-1 at 9 (col. 7 ll. 17). The court has construed "heater block" as "a solid piece of material, having at least one flat side." Doc. 101 at 11. As the court noted in its Claim Construction Order, the specification describes that the heater block is "preferably composed of an insulative type of material such as cork, synthetic cork, or a thermoset polymer" or alternatively "of a thermoplastic or ceramic material." Doc. 101 at 9 (citing Doc. 1-1 at 7 (col. 4 ll. 14–16)). The specification also describes a heater block as something that is manufactured "preferably by cutting a block of cork from raw stock and machining necessary features therein" or, alternatively, "a synthetic cork or thermoset polymer material can be molded to the desired shape and features of the heater block **30**." *Id.* (citing Doc. 1-1 at 7 (col. 4 ll. 17–22)).

The Shields Defendants' infringement contentions identify the insulation blanket surrounding the cups in the warmers as the "heater block." *See* Doc. 119-5 at 2–3 (§§ 1.a., 10.a.); *id.* at 14–15 (illustrations 7–9). The uncontroverted facts establish that the insulation blanket is a not a solid piece of material. The insulation blanket is composed of a spongy, pliable material that is wrapped around the exterior of each cup in a PENGUIN® single-bottle or four-bottle warmer. It is secured in place with a piece of tape joining the ends of the insulation

blanket and a black zip-tie. So, the insulation blanket is not solid because its ends are not fused or molded together, but, instead, merely are secured by tape. Also, when removed from the cup, the insulation blanket is an uninterrupted piece of pliable material of consistent width. *See* Doc. 119-2 at 5, ¶¶ 13–14. One can lay the insulation material flat as shown in the picture below:



Doc. 119-2 at 5, ¶ 13. Thus, the insulation blanket has no defined shape because one can manipulate the shape of the insulation blanket when removed from the cup. For all of these reasons, the uncontroverted facts establish that the insulation blanket is not a "a solid piece of material, having at least one flat side."

In their Opposition to Neonatal's Motion for Partial Summary Judgment, the Shields Defendants appear to have abandoned their infringement contention identifying the insulation blanket as the "heater block." Instead, the Shields Defendants appear to argue that the PENGUIN® warmer's outer metal shell and insulation blanket together form the "heater block." Doc. 133 at 25. But, as described above, the Shields Defendants never identified this theory in their infringement contentions. *See supra* Part I.A. And, Neonatal asserts that the court cannot consider it now.

Even if the court considers the Shields Defendants' new infringement contention, the uncontroverted facts also fail to establish that the outer metal shell of a PENGUIN® warmer and the insulation blanket together form a "heater block," as the court has construed that limitation. The outer metal shell is not a "solid piece of material." Instead, the case of a PENGUIN® warmer is hollow and contains some empty space. Mr. Koch designed the warmers to include this empty space and while this space contains some of the warmer's components, it is otherwise unfilled. So, the outer metal shell of the case is not a "solid piece of material." And, importantly, the outer metal shell and the insulation blanket together do not consist of a "solid piece of material." They are two separate and unconnected components of the warmer. So, they cannot consist of one "solid piece of material."

In sum, the court concludes that the Accused Products do not include a "heater block," which is one of the required elements of the Asserted Claims made by the '498 Patent. So, the Accused Products do not include "each and every claim limitation" as they must to provide a basis for a finding of literal infringement. The court thus concludes as a matter of law that the undisputed facts preclude the Shields Defendants from establishing literal infringement.

### b. "Removable Reservoir"

The court also concludes that the Accused Products lack another element of the Asserted Claims of the '498 Patent. The Asserted Claims of the '498 Patent include "at least one removable reservoir" "disposed within" either the void or well of the heater block. Doc. 1-1 at 8 (col. 6 ll. 48–49); Doc. 1-1 at 9 (col. 7 ll. 19–20). The court has construed "removable reservoir" as "a liquid-holding receptacle designed to be removed." Doc. 101 at 19.

The Shields Defendants assert that the cups of the single-bottle and four-bottle PENGUIN® warmers constitute the "removable reservoir" in the Asserted Claims. Doc. 119-5

at 2–3 (§§ 1.b., 10.b.), *id.* at 11–13, 16 (illustrations 1–5, 11).  They contend that the cups are removable because a user can remove a cup by unscrewing the six screws securing the top of the warmer's metal case, opening the metal case, removing the four nuts securing the cup to the top of the case, and unplugging the wire connectors from the circuit board.  Mr. Koch explains that he designed the cup so that a user easily could remove it using common hand tools.  Mr. Koch also assets that a user need not remove any other components from the cup—like the insulation blanket, the heater blanket, or the thermistor—to remove the cup from the warmer.  But, Mr. Koch also testified that these other components are all part of the warmer.  Doc. 141-4 at 6–7 (Koch Dep. 160:6–161:1, 162:22–163:14).  So, a user cannot remove the cup from the warmer without removing these components.[6]

As described in the Uncontroverted Facts section, one can remove the cup from the warmer, but the process involves ignoring warnings in the user manual and destroying certain components of the warmer.  The user manual specifically instructs the user not to remove the equipment cover and not to use the equipment in a manner not specified.  If a user ignored these warnings and unscrewed the top of the warmer, the user would need to remove several components before removing the cup.  First, the user must remove the orange foam insulation blanket covering the exterior of the cup by cutting the black zip-tie holding it in place and removing the tape that secures its ends together.  Next, the user must remove the heater blanket by dissolving the adhesive that secures it to the cup's exterior or by ripping it off of the cup's

---

[6]     If the Shields Defendants assert that the cup only must be removable from the heater block—not the entire warmer—the undisputed facts also fail to establish that the cup is designed to be removed from the heater block.  The Shields Defendants' infringement contentions identify the insulation blanket surrounding the cups in the warmers as the "heater block."  In Mr. Koch's explanation of how a user can remove the cup, he contends that the user need not remove the insulation blanket from the cup.  So, in his example, the cup is not removed from the "heater block."  Also, and as explained above, for a user to remove the insulation blanket, he or she must destroy the black zip-tie surrounding the insulation blanket and remove the tape securing the ends together.  The cup thus is not "designed to be removed" from the "heater block" because removal involves destruction of some components.

exterior.  The user next must remove the thermistor by cutting or removing the single use Kapton® tape securing the thermistor to the cup.  Next, the user must remove a weld securing an electrical grounding bracket to the exterior surface of the cup.  The user next must remove a zip-tie that secures the damper to the cup's exterior.  Finally, the user must remove the vibrating mechanism by removing the polymer adhesive securing it at the bottom of the cup.  After removing all of these components, the user could remove the cup from the warmer.  But, without these components, the warmer no longer would work for its intended purpose.  To make it operate again, the user would have to reassemble the unit, including supplying new zip-ties and adhesives.  But, even after reassembly, Neonatal would not place the unit in service until Neonatal personnel (or other trained biomedical technicians with appropriate testing equipment) had performed the required calibrations and verifications on the unit.  Also, Neonatal would require the unit to undergo quality and safety testing before placing the unit back in service, so the unit could maintain its safety certification.

The court concludes that the process required to remove the cup, as described above, does not make it a "removable reservoir" as the court has construed that limitation.  Indeed, as one court has concluded, "[t]he common, ordinary meaning of removable . . . does not include breaking what is meant to be a permanent connection."  *Little Giant Pump Co. v. Diversitech Corp.*, 505 F. Supp. 2d 1107, 1111 (W.D. Okla. 2007); *see also K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir. 1999) (concluding that "[a] rivet or a laminate . . . is meant to remain permanent, unremovable unless one is bent on breaking the permanent structure apart.").  Here, the cup is removable only by destroying other components of the warmer.  Giving this meaning to the word removable would make almost any connection a removable one no matter its consequences.  Like the court in *Little Giant Pump Co.*, the court concludes that the cup "cannot

be [removed] if it is attached using fasteners that are meant to be permanent and not removed," and so it "cannot meet the . . . claim limitation." 505 F. Supp. 2d at 1111 (granting summary judgment against a literal infringement claim because the accused device did not literally infringe a patent as a matter of law when it lacked one of the claim limitations—"removably supported"). Because the Accused Products lack a "removable reservoir," they do not literally infringe the Asserted Claims of the '498 Patent as a matter of law.

### c. "Void" or "Well"

The court also concludes that the Accused Products lack two other required elements of the Asserted Claims of the '498 Patent. Claim 1 of the '498 Patent and its dependent Asserted Claims require that the "heater block" comprise "at least one void therein." Doc. 1-1 at 8 (col. 6 ll. 47). The court has construed "void" as "an empty space formed in the heater block." Doc. 101 at 14. Claim 10 of the '498 Patent and its dependent Asserted Claims require that the "heater block" comprise "at least one well therein." Doc. 1-1 at 9 (col. 7 ll. 17). The court has construed "well" as "a shaft formed in the heater block." Doc. 101 at 15.

As already explained, the Shields Defendants' infringement contentions identify the insulation blanket surrounding the cups in the warmers as the "heater block." *See* Doc. 119-5 at 2–3 (§§ 1.a., 10.a.), *id.* at 14–15 (illustrations 7–9). This insulation blanket has no empty space or shaft formed within it. Instead, it is a spongy, pliable material of consistent width. *See* Doc. 119-2 at 5, ¶¶ 13–14. It has no defined shape, and it can be laid flat when removed from the cup.

The Shields Defendants contend that a void or well is formed in the "heater block" when the insulation blanket is wrapped around the exterior of the cup. Doc. 133 at 27. But the undisputed facts cannot abide this conclusion. Wrapping the insulation blanket around the cup does not create a void or well "formed in the heater block." Indeed, the specification requires

that the "void or well **38** [be] machined or formed in the heater block **30**." Doc. 1-1 at 7 (col. 4 ll. 38–40). The specification also requires that the material forming the heater block "be molded to the desired shape and features of the heater block **30**." *Id.* (col. 4 ll. 20–22). When one wraps the insulation blanket around the cup, no well or void is machined or molded in the insulation blanket. This process may produce an empty space, but it is not an empty space or shaft "formed in the heater block," as this limitation requires.

If the Shields Defendants assert that the outer metal case of the warmer is the "heater block" (a theory never disclosed by their infringement contentions), their infringement claim still would fail. With this theory, the Shields Defendants assert that the hollow space within the metal case constitutes a "void" or "well." But, neither is this hollow space "formed in the heater block" because it is not machined or molded into the outer metal case. Instead, the empty space exists simply because of the way the various components are connected together to construct the warmer.

The empty space in the metal case also cannot constitute a "well" because it includes no "shaft formed in the heater block." A "shaft" is "something suggestive of the shaft of a spear or arrow *especially in long slender cylindrical form*." *Shaft*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/shaft (last visited August 24, 2017) (emphasis added). The empty space in the metal case is not long, not slender, and not cylindrical. Instead, it is comprised of the empty space in the rectangular metal case that surrounds the cup and its various attached components. The hole in the top of the case also does not comprise a "well" because the empty space there is wide and flat—and only as long as the thickness of the case's thin metal shell.

For all these reasons, the court concludes that the Accused Devices contain no "well" or "void" as the Asserted Claims of the '498 Patent require. Without the required elements, the Accused Devices cannot literally infringe the Asserted Claims of '498 Patent as a matter of law. The court thus grants summary judgment against the Shields Defendants' patent infringement counterclaim (Count I). The court also grants a reciprocal summary judgment for Neonatal on its claim for a declaratory judgment of non-infringement.

## 2. Has Neonatal Breached the License Agreement?

Neonatal next moves for summary judgment against the Shields Defendants' counterclaim for breach of an Exclusive License Agreement (Count III). The Shields Defendants assert that Neonatal breached the Exclusive License Agreement when it stopped making royalty payments in early 2013. But, Neonatal argues, an accord and satisfaction bars this claim because the parties resolved their dispute about the royalty payments on September 27, 2013, when they executed the Letter of Intent.

Before turning to the substance of Neonatal's argument, the court must decide if it even can consider this defense. The Shields Defendants assert that Neonatal has waived the affirmative defense of accord and satisfaction because it never pleaded it in its Answer to the Shields Defendants' Counterclaim. Neonatal concedes that it never pleaded this affirmative defense, but it contends that it still may assert the defense because the Shields Defendants have had notice of the defense and an opportunity to challenge it.

To support their waiver argument, the Shields Defendants cite the requirement of Rule 8(c)(2). It requires a party "pleading to a preceding pleading [to] set forth affirmatively all matters which the pleading party intends to use as an avoidance or affirmative defense." *Radio Corp. of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir. 1970) (citing Fed. R. Civ.

P. 8(c)).  "If such defenses are not affirmatively pleaded, asserted with a motion under Rule 12(b) or tried by the express or implied consent of the parties, such defenses are deemed to have been waived and may not thereafter be considered as triable issues in the case."  *Id.*  In *Radio Corp.*, the Tenth Circuit held that a defendant's failure to raise an affirmative defense before trial waived the right to a jury instruction on this affirmative defense.  *Id.*  The Circuit noted, however, that it was "not holding that if a party fails to raise an affirmative defense in his original responsive pleadings he is forever barred from raising it.  Normally the proper remedy is to move for leave to amend under Rule 15 of the Federal Rules of Civil Procedure."  *Id.* at 17 n.4.

Indeed, the Circuit has affirmed results relying on an affirmative defense where the responsive pleadings never asserted the affirmative defense.  These cases reason that a trial court has discretion to allow amendments to the pleadings if the opposing party fails to establish prejudice.  *See*, *e.g.*, *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir. 2009) (holding that a district court did not err by allowing a party to supplement its brief and present evidence of an affirmative defense because the opposing party "had notice of the defense . . . and, therefore, suffered no prejudice from [the] failure to comply with Rule 8(c)"); *Ahmad v. Furlong*, 435 F.3d 1196, 1201–03 (10th Cir. 2006) (holding that a defendant may raise an affirmative defense for the first time in a summary judgment motion if the delayed assertion did not prejudice the plaintiff); *Marino v. Otis Eng'g Corp.*, 839 F.2d 1404, 1408 (10th Cir. 1988) (holding "no trial by ambush" existed when the trial court allowed a defendant to present evidence of contributory negligence (but refused to give an jury instruction) because plaintiff was advised of the affirmative defense at least three months before trial).

In these cases, the Circuit has recognized the "general rule" that a "party waives its right to raise an affirmative defense at trial when the party fails to raise the defense in its pleadings." *Creative Consumer Concepts, Inc.*, 563 F.3d at 1076 (citing *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988)). But, when "considering this rule, [the court] must keep in perspective that 'the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses.'" *Id.* (quoting *Hassan*, 842 F.2d at 263). Thus, a court "must avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule." *Id.* (quoting *Hassan*, 842 F.2d at 263). The purpose of Rule 8(c) is "that of putting 'plaintiff on notice well in advance of trial that defendant intends to present a defense in the nature of an avoidance[.]'" *Marino*, 839 F.2d at 1409 (quoting *State Distribs., Inc., v. Glenmore Distilleries Co.*, 738 F.2d 405, 410 (10th Cir. 1984)). So, "[w]hen a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice." *Creative Consumer Concepts, Inc.*, 563 F.3d at 1076 (quoting *Hassan*, 842 F.2d at 263). "And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." *Id.* (quoting *Hassan*, 842 F.2d at 263).

Here, the Shields Defendants sustained no prejudice. In its original and Amended Complaint, Neonatal asserted that the parties had entered into a Letter of Intent on September 27, 2013, that "resolved their dispute over contested royalties under the terminated Exclusive License Agreement and agreed to negotiate in good faith in an attempt to enter into a new license agreement that would include pending patent applications . . . ." Doc. 1 at 4, ¶ 19; Doc. 49 at 5, ¶ 22; Doc. 166 at 3, ¶ 22. The Shields Defendants admitted this allegation in their original and Amended Answers. Doc. 30 at 3, ¶ 19; Doc. 52 at 3, ¶ 22. Indeed, Mr. and Mrs. Shields are

parties to the Letter of Intent, and thus they knew about its existence and terms since the day they signed it.[7] Under similar circumstances, our court has allowed a party to assert an affirmative defense not raised in a responsive pleading when the opposing party had "fair notice" of the defense based on defendant's factual denials in an answer and disclosure of the defense in the pretrial order. *Ackley v. Dep't of Corrs.*, 844 F. Supp. 680, 685 (D. Kan. 1994). This is the situation here. The Shields Defendants had fair notice of the accord and satisfaction affirmative defense.

Indeed, the Shields Defendants never argue in their Opposition that they lacked notice of this defense. And they never argue that they have sustained prejudice because Neonatal omitted the defense from its pleadings. Instead, the Shields Defendants urge the court to apply a rigid construction of Rule 8(c) and hold that Neonatal is barred from asserting this defense. But, this approach conflicts with Tenth Circuit precedent and the liberal pleading rules of the Federal Rules of Civil Procedure. *See Ackley*, 844 F. Supp. at 685 (concluding that plaintiff's interpretation of Rule 8(c) was "too stringent" and refusing to bar an affirmative defense when plaintiff had "fair notice" of the defense). Because the court concludes that Neonatal's assertion of this affirmative defense does not prejudice the Shields Defendants, the court considers the accord and satisfaction affirmative defense.

In Kansas,[8] accord and satisfaction "is an affirmative defense and must be proven by a preponderance of the evidence." *EF Hutton & Co. v. Heim*, 694 P.2d 445, 451 (Kan. 1985).

---

[7]     Neonatal also has attempted to preserve this affirmative defense in the Pretrial Order (although the Shields Defendants have objected to its late disclosure). Doc. 144 at 20 & nn. 7, 8, § 4.d.1. (Pretrial Order). The court recognizes, however, that the court filed the Pretrial Order after the parties briefed Neonatal's pending Motion for Partial Summary Judgment.

[8]     The Shields Defendants' counterclaim for breach of the Exclusive License Agreement is governed by Kansas law under that Agreement's choice of law clause. Doc. 144 at 2, ¶ 1.d (Pretrial Order).

Accord and satisfaction requires "an offer in full satisfaction of an obligation, accompanied by such acts and declarations or made under such circumstances that the party to whom the offer is made is bound to understand that if he accepts the offer, it is in full satisfaction of and discharges the original obligation." *Id.* Put another way, "[a]n accord is a contract between creditor and debtor for the settlement of the claim by some performance other than that which is due. Satisfaction takes place when the accord is performed." *Thompson v. Meyers*, 505 P.2d 680, 685 (Kan. 1973) (quoting *Lighthouse for the Blind v. Miller*, 86 P.2d 508, 508 Syl. ¶ 1 (Kan. 1939)). The Kansas Supreme Court has described an accord and satisfaction "as an adjustment of a disagreement as to what is due from one party to another through payment of an agreed amount," and requires that it is "consummated by a meeting of the minds and accompanied by sufficient consideration." *Id.*

Here, the undisputed facts establish that Neonatal and Mr. and Mrs. Shields entered into a Letter of Intent. This letter, effective on September 27, 2013, resolved the parties' dispute over contested royalties under the terminated Exclusive License Agreement. The Letter of Intent required Neonatal to make two payments: (1) the first one due the day the Letter of Intent was signed as full payment for 2013 1st Quarter royalties due under the terminated Exclusive License Agreement; and (2) the second one due within 30 days of the Letter of Intent's execution as full payment for the portion of the 2013 2nd Quarter royalties due under the terminated Exclusive License Agreement for product sales made before the termination date of May 23, 2013. Neonatal made, and Mr. and Mrs. Shields accepted, both payments required by the Letter of Intent.

Section 3.c. of the Letter of Intent agrees: "The parties acknowledge that no other royalty payments are due under the terminated Exclusive License Agreement for product sales made

prior to the May 23, 2013 termination." Doc. 120-2 at 2. So, by the terms of their agreement, the parties agreed that Neonatal did not owe any royalty payments other than the two specified by the Letter of Intent.

The parties also agreed in the Letter of Intent to negotiate in good faith in an attempt to enter into a new license agreement that would include Mr. and Mrs. Shields' pending patent applications. Neonatal and Mr. and Mrs. Shields never agreed on the terms of a new license agreement. The parties' Letter of Intent anticipated that this possibility. It expressly addresses the parties' rights and obligations in that circumstance. Section 5.d. of the Exclusive License Agreement provides: "If the New License Agreement is not executed, [Neonatal] is not obligated to pay any royalties pursuant to the Exclusive License Agreement for any product sales that occurred after May 23, 2013, but neither party will have waived any rights it had with respect to any obligations that survived the termination of the Exclusive License Agreement, including Licensors' right to sue Licensees for patent infringement." *Id.* So, under this section, Neonatal owed no obligation to pay any royalties under the Exclusive License Agreement for any product sales occurring after May 23, 2013, but the Shields Defendants expressly reserved their right to sue Neonatal for patent infringement.

On these undisputed facts, the Letter of Intent's provisions governing royalty payments is an accord. And, Neonatal's payment of the agreed-upon amounts is a satisfaction. The court thus concludes that no reasonable jury could conclude from the undisputed facts that Neonatal is liable for breaching the Exclusive License Agreement because the Letter of Intent produced an accord and satisfaction discharging Neonatal's royalty payment obligations under the Exclusive License Agreement.

The Shields Defendants assert that the Letter of Intent did not produce an accord and satisfaction because the agreement was not "consummated by a meeting of the minds," as Kansas law requires. *EF Hutton & Co.*, 694 P.2d at 451. To support this argument, the Shields Defendants cite Mrs. Shields' deposition testimony. Neonatal responds that the court can rely on this testimony only "[i]n the absence of documents or acts directly evidencing a 'meeting of the minds'" between the parties. *FDIC v. Addleman*, 750 P.2d 1037, 1040 (Kan. 1988). Here, no such absence exists. To the contrary, the Letter of Intent provides in its very first sentence that the parties have entered it "in order to set forth their collective intent as to the matters provided herein." Doc. 120-2 at 1. The Letter of Intent also provides that: "Both parties believe the other party breached material provisions of the terminated Exclusive Agreement and these alleged breaches have not been cured" but "[t]he parties now wish to settle their disputes under the terminated Exclusive License Agreement and negotiate it in good faith in an attempt to execute a New License Agreement . . . ." *Id.* The Letter of Intent thus explicitly identifies the parties' intent. And that intent demonstrates a meeting of the minds.

In any event, the testimony by Ms. Shields does not help the Shields Defendants' argument. It only provides more evidence that a meeting of the minds occurred. Although Ms. Shields testified that she did not "think" the Letter of Intent resolved the dispute over royalty payments, she also conceded that the parties "were trying to work together again" and that she signed the agreement "to get the money." Doc. 133 at 30–31 (citing Doc. 133-4 at 8–10 (Shields Dep. 227:18–24, 229:19–25)). Kansas law does not permit a party to sign an agreement as plain as this one to "get the money" only to renounce the agreement they have signed. Ms. Shields' testimony evidences an accord and satisfaction. The parties agreed to resolve their royalty

dispute by entering the Letter of Intent, and Neonatal satisfied its obligations by making the required payments.

The Shields Defendants also argue that they reserved a right to assert a claim for unpaid royalty payments under section 5.d. of the Letter of Intent. But the words in this provision cannot support the meaning they attribute to it. Section 5.d. preserved the Shields Defendants' right to assert claims that survive the agreement, including a patent infringement claim against Neonatal. But, this section explicitly extinguishes Neonatal's obligation to pay any royalties under the Exclusive License Agreement for any product sales occurring after May 23, 2013.

In sum, the undisputed evidence establishes that the Letter of Intent produced an accord and satisfaction that discharged Neonatal's obligations to pay royalties under the Exclusive License Agreement. The Shields Defendants' counterclaim for breach of the Exclusive License Agreement based on Neonatal's failure to make royalty payments thus fails as a matter of law. The court grants summary judgment against Count III of the Shields Defendants' Counterclaim.

### 3. Has Scott Norman Induced Patent Infringement?

Count II of the Shields Defendants' Counterclaim asserts a claim against Scott Norman, Neonatal's CEO, for inducing patent infringement under 35 U.S.C. § 271(b). Neonatal seeks summary judgment against this counterclaim, asserting that Mr. Norman is not liable for inducing patent infringement when no infringement has occurred. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) ("[L]iability for induced infringement [under 35 U.S.C. § 271(b)] must be predicated on direct infringement."); *see also Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308 (Fed. Cir. 2012), *rev'd on other grounds by* 134 S. Ct. 2111 (2014) ("[I]nducement gives rise to liability only if the inducement leads to actual infringement . . . there is no such thing as attempted patent infringement."). These

authorities control the decision on Count II. Because the court concluded in Part II.C.1 above that Neonatal has not infringed the '498 Patent, Mr. Norman cannot incur liability for inducing patent infringement as a matter of law. The court thus grants summary judgment against Count II of the Shields Defendants' Counterclaim.

### 4. Has Scott Norman Tortiously Interfered with a Contract?

Count V of the Shields Defendants' Counterclaim asserts that Mr. Norman tortiously interfered with a contract by directing Neonatal and Creche to breach the Exclusive License Agreement. In Kansas,[9] "a person who, without justification, induces or causes a breach of contract will be answerable for any damages caused thereby." *Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 150 (Kan. 2003). "A claim for tortious interference with a contractual relationship requires the existence of a valid and enforceable contract at the time of the interference between the plaintiff *and a third party*." *Macke Laundry Serv. Ltd. P'ship v. Mission Assocs., Ltd.*, 873 P.2d 219, 225 (Kan. Ct. App. 1994) (emphasis added).

Kansas law is well settled. An "official of a corporation, acting for the corporation, and within the scope of his or her representation of the corporation, cannot be liable for tortious interference with a contract the corporation could legally act on." *Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008) (citing *Clevenger v. Catholic Social Serv. of Archdiocese*, 901 P.2d 529, 533 (Kan. Ct. App. 1995)). In these situations, "[i]t is the corporation acting," not the director or officer. *Id.* But, if "an employee is motivated entirely by personal reasons such as malice or spite or by a desire to accomplish some unlawful purpose and does not have for its purpose the furtherance of the employer's business," that employee acts outside the scope of his employment and can be incur liability for tortious interference. *Williams v. Cmty. Drive-In*

---

[9]    The Shields Defendants' counterclaim for tortious interference with a contract is governed by Kansas law under the doctrine of *lex loci delicti*. Doc. 144 at 2, ¶ 1.d (Pretrial Order).

*Theater, Inc.*, 520 P.2d 1296, 1301–02 (Kan. 1974); *see also Battenfeld of Am. Holding, Inc. v. Baird, Kurtz & Dobson*, No. 97-2336-JWL, 1999 WL 232915, at *4 (D. Kan. Feb. 5, 1999) ("Kansas does not recognize a claim for tortious interference with contract against an agent or employee of one of the contracting parties, unless there is some suggestion that the agent or employee was acting in his or her individual capacity or for his or her individual advantage.").

Here, Neonatal and Mr. and Mrs. Shields signed the Exclusive License Agreement. As CEO, Mr. Norman served as Neonatal's officer. And, nothing in the summary judgment record shows that Mr. Norman acted on behalf of anyone other than Neonatal during the times relevant to this dispute. Indeed, the Shields Defendants assert in their Second Amended Answer and Counterclaims that "Neonatal benefited from . . . ceasing to make royalty payments under the Exclusive License Agreement to Janice and Paul Shields." Doc. 166 at 11, ¶ 50. So, according to the Shields Defendants' allegations, Mr. Norman was acting to further Neonatal's interest. And, the Shields Defendants have adduced no evidence that Mr. Norman acted in his personal capacity or with malice or spite to make him liable for tortious inference. On this record, no reasonable jury could find Mr. Norman liable for tortious interference. The court thus grants summary judgment against Count V of the Shields Defendants' Counterclaim.

### 5. Was Neonatal Unjustly Enriched?

Count VIII of the Shields Defendants' Counterclaim asserts that Neonatal and Creche were unjustly enriched by profits and royalties from sales of PENGUIN® warmers. To support this counterclaim, the Shields Defendants rely on the same factual contentions they rely on to support their counterclaim for breach of the Exclusive License Agreement—that Neonatal retained profits and royalty payments from sales of PENGUIN® machines and products covered

by the Exclusive License Agreement.  Doc. 144 at 19, ¶ 31 (Pretrial Order); Doc. 166 at 17, ¶¶ 110–111 (Second Amended Answer and Counterclaims).

Neonatal asserts that the same accord and satisfaction defense bars the Shields Defendants' unjust enrichment counterclaim, just as it did for their counterclaim for breach of the Exclusive License Agreement.  The court agrees.  In Kansas,[10] unjust enrichment has three elements: "(1) a benefit conferred; (2) an appreciation or knowledge of the benefit by the one receiving the benefit; and (3) the acceptance or retention of the benefit under such circumstances as to make it inequitable to retain the benefit without payment of its value."  *In re Estate of Sauder*, 156 P.3d 1204, 1220 (Kan. 2007).  Here, the summary judgment facts establish that the parties resolved their dispute over unpaid royalties by agreeing to the Letter of Intent.  No reasonable jury could conclude that the enrichment Neonatal received resulted from an explicit, written agreement, *i.e.*, the Letter of Intent signed by the Shields Defendants.  Or, to say it more bluntly, enrichment derived from a bargained for and mutually agreed contract is not, as a matter of law, unjust.  The Shields Defendants' unjust enrichment claim fails as a matter of law.

The Shields Defendants take a different tack in their Opposition.  They argue that their unjust enrichment counterclaim is independent of their counterclaim for breach of the Exclusive License Agreement.  Instead, they contend, their unjust enrichment counterclaim asserts that it is inequitable to allow Neonatal to "benefit from the '498 Patent by selling the machine disclosed in the patent and marking the machine with that number, while refusing to pay royalties to the patent owner."  Doc. 133 at 35.  Neonatal asserts that the Shields Defendants have changed their theory supporting the unjust enrichment counterclaim, and the new theory merely duplicates

---

[10]     Under the doctrine of *lex loci delecti*, Kansas law also governs the Shields Defendants' counterclaim for unjust enrichment.  Doc. 144 at 2, ¶ 1.d (Pretrial Order).

their patent infringement counterclaim. And, they assert that such a claim is preempted by federal law.

Indeed, one cannot rely on state law to "create a collateral set of rights available as an adjunct or expansion to patent rights." *Waner v. Ford Motor Co.*, 331 F.3d 851, 856 (Fed. Cir. 2003). And, as the Federal Circuit has held, "any attempt to obtain a patent-like royalty for the making, using, or selling of a product in the public domain under the rubric of state unjust enrichment law is preempted." *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1382 (Fed. Cir. 2005) (affirming dismissal of an unjust enrichment claim asserting that defendant received an unjust benefit from use of technical information that plaintiff gave defendant because "federal patent law preempt[ed] [the] unjust enrichment claim, as pled"); *see also Veto Pro Pac, LLC v. Custom Leathercraft Mfg. Co., Inc.*, No. 3:08-cv-00302(VLB), 2009 WL 276369, at *2 (D. Conn. Feb. 5, 2009) (concluding that an unjust enrichment claim was "completely preempted" because it simply incorporated the allegations of two patent infringement claims). To the extent the Shields Defendants use their unjust enrichment theory to enforce rights under federal patent law, this federal law preempts the state law claim. And, to the extent they use their unjust enrichment counterclaim to recover royalties owed under the Exclusive License Agreement, their counterclaim is barred by accord and satisfaction.

## III. Conclusion

For the reasons explained above, the court grants summary judgment for Neonatal on its declaratory judgment claim. The court enters a declaratory judgment that Neonatal has not infringed the '498 Patent. The court also grants summary judgment against the Shields Defendants' counterclaims for patent infringement (Count I), inducement of patent infringement

(Count II), breach of an Exclusive License Agreement (Count III), tortious interference with contract (Count V), and unjust enrichment (Count VIII).

**IT IS THEREFORE ORDERED BY THE COURT THAT** Neonatal and the Counterclaim Defendants' Motion for Partial Summary Judgment (Doc. 118) is granted.

**IT IS FURTHER ORDERED THAT** Neonatal and the Counterclaim Defendants' Motion to Strike (Doc. 140) is granted.

**IT IS FURTHER ORDERED THAT** the Shields Defendants' Motion to Strike (Doc. 151) is denied.

**IT IS SO ORDERED.**

**Dated this 24th day of August, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**