## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**NEONATAL PRODUCT GROUP, INC.,**

       **Plaintiff/Counterclaim**
       **Defendant,**

**v.**

**JANICE M. SHIELDS,**
**PAUL W. SHIELDS, and ANGELE**
**INNOVATIONS, LLC,**

       **Defendants/Counterclaimants,**

**v.**

**CRECHE INNOVATIONS, LLC,**
**MILLENNIUM MARKETING**
**GROUP, LTD., and**
**SCOTT A. NORMAN,**

       **Counterclaim Defendants.**

**Case No. 13-2601-DDC-KGS**

## <u>MEMORANDUM AND ORDER</u>

This matter comes before the court on cross motions for summary judgment filed by each party to this patent infringement dispute. Plaintiff Neonatal Product Group, Inc. ("Neonatal"), doing business as Creche Innovations, LLC ("Creche"), initiated this lawsuit against Janice M. Shields and Paul W. Shields, individually and as trustees of the Shields Family Trust, and Angele Innovations, LLC (collectively, "the Shields"), by filing a Complaint asserting two claims: (1) a declaratory judgment that Neonatal has not infringed U.S. Patent No. 6,417,498 ("the '498 Patent"); and (2) a declaratory judgment that the Asserted Claims of the '498 Patent are invalid. Doc. 49 (Amended Complaint ¶¶ 36–41); Doc. 143 at 19 (Pretrial Order ¶ 4.a.).

The Shields responded to the lawsuit by filing an Answer and Counterclaim (Doc. 30). It asserted eight counterclaims against four counterclaim defendants: Neonatal, Creche, Millennium Marketing Group, Ltd., and Scott Norman (collectively, "the Counterclaim Defendants"). The eight counterclaims asserted against the Counterclaim Defendants include: (1) patent infringement; (2) inducement of patent infringement; (3) breach of an Exclusive License Agreement; (4) breach of a Patent Marketing Agreement; (5) tortious interference with contract; (6) breach of fiduciary duty; (7) intentionally causing or assisting an agent to violate the duty of loyalty; and (8) unjust enrichment. Doc. 143 at 20 (Pretrial Order ¶ 4.c.).

On August 24, 2017, the court granted Neonatal and the Counterclaim Defendants'[1] Motion for Partial Summary Judgment. Doc. 180. In its Memorandum and Order, the court granted summary judgment for Neonatal on its declaratory judgment claim and entered a declaratory judgment that Neonatal has not infringed the '498 Patent. *Id.* at 27–34, 45. Naturally, the court also granted summary judgment against the Shields' counterclaims for patent infringement (Count I) and inducement of patent infringement (Count II). And the court granted summary judgment against the Shields' counterclaims for breach of an Exclusive License Agreement (Count III), tortious interference with contract (Count V), and unjust enrichment (Count VIII). *Id.* at 45–46.

Nonetheless, the Shields now have filed a Motion for Partial Summary Judgment (Doc. 188) requesting two things that directly contradict the rulings in the earlier Order on summary judgment. First, the Shields seek summary judgment *against* Neonatal's declaratory judgment claim seeking a declaration that Neonatal did not infringe the '498 Patent. And second, they seek summary judgment *in their favor* on their counterclaim for patent infringement (Count I).

---

[1] Going forward, the court refers to the four Counterclaim Defendants collectively as Neonatal.

*Id.* The Shields seek summary judgment on these claims even though the court already has ruled, as a matter of law, in Neonatal's favor on both claims. *See generally* Doc. 180.

Neonatal also has filed a summary judgment motion. It is a Motion for Summary Judgment on the Remaining Counterclaims (Doc. 185). It seeks summary judgment against all of the Shields' undecided counterclaims, *i.e.*, (1) breach of a Patent Marketing Agreement (Count IV); (2) breach of fiduciary duty (Count VI); and (3) intentionally causing or assisting an agent to violate the duty of loyalty (Count VII).

For reasons explained below, the court denies the Shields' Motion for Partial Summary Judgment (Doc. 188). And the court grants Neonatal's Motion for Summary Judgment on the Remaining Counterclaims (Doc. 185) in part and denies it in part.

## I.    Uncontroverted Facts

The following facts are either stipulated facts taken from the Pretrial Order (Doc. 143), uncontroverted, or, where controverted, stated in the light most favorable to the parties opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### The '498 Patent

Defendants Janice M. Shields and Paul W. Shields are the named inventors of the '498 Patent that issued on July 9, 2002. The device disclosed in the '498 Patent is called the "Neonatal Substrate Warmer." The device automatically warms and vibrates baby bottles containing frozen or refrigerated breast milk so that the milk thaws, warms, and mixes quickly and efficiently. The Shields owned the '498 Patent until August 2010, when they transferred the patent's ownership to the Shields Family Trust dated August 19, 2010 ("Shields Family Trust"). Mr. and Ms. Shields serve as trustees of the Shields Family Trust.

### The Shields Contract to Commercialize the '498 Patent

In 2004, Counterclaim Defendant Millennium Marketing Group, Ltd. ("MMG") contacted the Shields to assist them with commercializing the '498 Patent. MMG was a patent marketing company familiar with patents and intellectual property license agreements.[2] Through this communication, the Shields first became acquainted with Counterclaim Defendant Scott Norman—an owner and President of MMG. In 2006, Mr. Norman created another company— plaintiff Neonatal—who sought to license the '498 Patent. Mr. Norman is Neonatal's Chief Executive Officer. When Mr. Norman introduced the Shields to Neonatal, through his patent marketing company MMG, he owned both companies.

On April 27, 2004, Mr. and Ms. Shields entered into a Patent Marketing Agreement with MMG. MMG and the Shields twice amended the Patent Marketing Agreement. The parties first amended the Patent Marketing Agreement on October 13, 2005—extending its term to October 13, 2006. The parties amended the Patent Marketing Agreement again on June 9, 2006.

On June 1, 2006, Mr. and Ms. Shields—together with MMG—entered an Exclusive License Agreement with Neonatal. The Exclusive License Agreement granted an exclusive license to Neonatal to manufacture and sell products covered by the '498 Patent. The Shields, as individuals, entered the Exclusive License Agreement with Neonatal.

### The Patent Marketing Agreement

The Patent Marketing Agreement defines Mr. and Ms. Shields as the "Client" and the '498 Patent as the "Product." The Patent Marketing Agreement imposed several obligations on MMG during its term. At least 14 of these obligations appear in Section 3 of the Patent Market Agreement. Section 3's obligations include:

---

[2]    MMG was a Kansas corporation with its offices and principal place of business in Overland Park, Kansas. On December 30, 2014, MMG was dissolved under Kan. Stat. Ann. § 17-6804.

(a)     Promote the "Client" and the "Product" and to develop a proprietary database of qualified Licensees that are commensurate with the potential for the "Product".

(b)     Communicate with potential Licensees and negotiate the most favorable license terms for the "Product" and with all Licensees.  "Client" shall have final approval of all terms agreed to with Licensees.

(c)     Abide by the "Client's" policies as communicated to "MMG" at any time during the Licensing process.

(d)     "MMG" shall act as an independent contractor and be solely responsible for and bear all expenses incurred as a result of "MMG's" office facilities and business activities generally.

(e)     Keep "Client" informed on progress of the marketing efforts and provide a written report of this progress on a quarterly basis (minimum of four written reports).

(f)     Not make any written or oral promises to any Licensee or potential Licensee without the prior knowledge and approval of the "Client".

(g)     Notify "Client" of any products that appear to infringe on the patent or trademark protection of the "Product".

(h)     Prepare a comprehensive Product Prospectus that is written exclusively for the "Product" and obtain "Client's" written approval prior to submission to potential Licensees.

(i)     Prepare a financial Pro Forma; including costs to manufacture, sales projections and other balance sheet items that match the licensees and Obtain "Client's" written approval prior to submission to potential Licensees.

(j)     Produce a media kit designed exclusively for the "Product" containing the above Product Prospectus and financial Pro Forma to be used in presentations with each potential Licensee and obtain "Client's" written approval prior to submission to potential Licensees.

(k)     Develop a web page for the "Product" and provide World Wide Internet presence during the term of this agreement.

(l)     During the term of this agreement "MMG" shall represent the "Product" at a minimum of two (2) applicable trade shows.

5

Doc. 24-1 at 1–3 (Patent Marketing Agreement). Ms. Shields testified that the purpose of MMG's obligations in paragraphs 3(a) through 3(l) was to secure a license for the '498 Patent. Ms. Shields also testified that she was not sure if these obligations applied to MMG after the parties executed the Exclusive License Agreement because she thought the Exclusive License Agreement effectively "replaced" the obligations listed in sections 3(a) through 3(l) of the Patent Marketing Agreement.

The Patent Marketing Agreement imposed two more obligations on MMG in sections 3(m) and 3(n):

> (m)    After a licensing agreement has been executed "MMG" shall provide account management with each Licensee and act as "Client[']s" liaison for the entire term of the license agreements.

> (n)    "MMG" shall be responsible for collection and distribution to "Client" of all royalties due. "MMG" shall distribute "Client's" portion of these royalties within three (3) business days of receipt from Licensee.

Doc. 24-1 at 3 (Patent Marketing Agreement).

Under paragraph 3(m), Ms. Shields testified that that MMG acted as a liaison—"more or less"—between the Shields and Neonatal during the term of the Exclusive License Agreement. Doc. 186-4 at 5 (Janice M. Shields Dep. 120:24–121:1). In reference to paragraph 3(n), Ms. Shields testified that MMG collected and distributed royalties from Neonatal, passing those royalties on to Ms. Shields.

The parties also agreed in the Patent Marketing Agreement that MMG would receive 50% of all royalties paid to the Shields for the first five years of any license agreement the parties entered during the Patent Marketing Agreement's term.

6

***MMG Hires Drake Koch to Design a Milk Warmer Based on the '498 Patent***

In 2006, MMG hired a product developer named Drake Koch to design a milk warmer based on the '498 Patent.  Mr. Koch ultimately designed for MMG what became known as the PENGUIN® Single Well Warmer and the PENGUIN® Four Well Warmer.  Mr. Koch also is responsible for the commercial design of THERMA-LINER™ bags.

While Mr. Koch was designing the PENGUIN® warmers, Ms. Shields talked extensively with him to make sure that he "didn't mess it up."  Doc. 186-4 at 3 (Janice M. Shields Dep. 74:9–16).  Ms. Shields also testified that she worked with Mr. Koch "a lot" and made a long list of things for him to do and not do as he designed the PENGUIN® warmers and THERMA-LINER™ bags.  *Id.* (Janice M. Shields Dep. 74:17–22).

***The Exclusive License Agreement***

Before the parties entered the Exclusive License Agreement, Scott Norman disclosed to Mr. and Ms. Shields that he would be involved in Neonatal's management, in addition to his role with MMG.  When the parties entered the Exclusive License Agreement, Neonatal believed that the '498 Patent covered the PENGUIN® milk-warming machines and THERMA-LINER™ bags it manufactured and sold under the Exclusive License Agreement.

The parties to the Exclusive License Agreement acknowledged and agreed that they were independent contractors and that they would not "be considered representative, master or servant of the other party for any purpose whatsoever," that "neither party has any authority to enter into an Agreement to assume any obligation or to give warranties or representations on behalf of the other party," and that nothing in their relationship would "be construed to create a relationship of joint venture, partnership fiduciary, or other similar relationship between the parties."  Doc. 122-1 at 8 (Exclusive License Agreement § 10.10.01).

7

The Exclusive License Agreement required Neonatal to pay a 10% royalty on all sales of technology covered by the '498 Patent. Doc. 122-1 at 2 (Exclusive License Agreement § 6.01.0). The royalty was payable to MMG, which was "designated as agent [of Mr. and Ms. Shields] to receive all royalty payments, consulting fees, commitment fees, and reports" on their behalf. *Id.* at 3 (Patent Marketing Agreement §§ 7.03.0, 7.01.0).

Under the Patent Marketing Agreement and its amendments, MMG kept between 40% and 60% of the royalties received from sales under the Exclusive License Agreement and distributed the rest to Mr. and Ms. Shields. Doc. 194-2 at 3–4 (Patent Marketing Agreement § 6); *id.* at 6 (Amendment to Patent Marketing Agreement § 1); *id.* at 7 (Amendment to Patent Marketing Agreement § 1).

Mr. Norman signed the Patent Marketing Agreement, both of its amendments, and the Exclusive License Agreement on MMG's behalf as its president. Mr. Norman was not a party— individually—to any of the agreements or amendments.

### The Parties' Performance Under the Agreements

Neonatal initially paid royalties to the Shields for sales of the PENGUIN® warmers consistent with the Exclusive License Agreement. Then, in early 2013, Neonatal stopped making royalty payments. Neonatal continued to sell PENGUIN® warmers. By mid-2013, Neonatal had concluded that the '498 Patent did not actually cover its PENGUIN® machines.

Neonatal marked its PENGUIN® warmers with "US Patent #6,417,498" during the term of the Exclusive License Agreement. This marking denotes the '498 Patent. Neonatal also advertised that its PENGUIN® warmers used patented technology.

*Termination of the Agreements*

On May 23, 2013, Mr. and Ms. Shields terminated the Exclusive License Agreement and the Patent Marketing Agreement.  After Mr. and Ms. Shields gave Neonatal notice of the termination, Neonatal stopped marking its PENGUIN® warmers with the '498 Patent's number.

Ms. Shields asserts that MMG failed to perform its obligations under the Patent Marketing Agreement in several ways:  (1) it failed to develop a database of qualified licensees as section 3(a) requires; (2) it never prepared a product prospectus as section 3(h) requires; (3) it never prepared a financial pro forma as section 3(i) requires; (4) it never produced a media kit as section 3(j) requires; and (5) it never developed a webpage for the products as section 3(k) requires.

Ms. Shields calculates that the Shields received $358,413.40 in payments during the term of the Exclusive License Agreement.  After an audit of royalty payments for 2010 through 2012 revealed that Neonatal had underpaid Mr. and Ms. Shields by $703.42 over that three-year period, Neonatal reimbursed Mr. and Ms. Shields for the underpayment.  Ms. Shields contends that this underpayment constitutes a violation of section 3(n) of the Patent Marketing Agreement which required MMG to collect and distribute all of the royalties due within three days.

In this lawsuit, the Shields seek as damages for their counterclaim asserting breach of the Patent Marketing Agreement a royalty of 10% of the gross sales of Neonatal's PENGUIN® products since the Exclusive License Agreement's termination.  The Shields contend that 10% of Neonatal's gross sales from June 2013 through July 2016 is $755,100.  The Shields intend to update the total using post-July 2016 sales information.  Doc. 143 at 25 (Pretrial Order ¶ 5.b.A.i.).

For their counterclaims asserting breach of fiduciary duty and intentionally causing and assisting in the breach of fiduciary duty and duty of loyalty, the Shields seek as damages Neonatal's profits on its sales of the PENGUIN® products since the Exclusive License Agreement's termination and Neonatal's profits on its sale of the PENGUIN® product line.  The Shields contend that Neonatal's profits between June 2013 and July 2016 are $7,550,999 and intend to update the total using post-July 2016 sales information.

The Shields also seek recovery of punitive damages for breach of fiduciary duty and intentionally causing and assisting in the breach of fiduciary duty and duty of loyalty.  The Shields contend that three times Neonatal's profits from June 2013 through July 2016 is $22,652,997.  The Shields intend to update the total using post-July 2016 sales information.  Finally, the Shields seek their attorneys' fees and costs, appropriate injunctive or other equitable relief, and pre- and post-judgment interest.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

The court applies this same standard to cross motions for summary judgment.  Each party bears the burden of establishing that no genuine issue of material fact exists and that it is entitled, as a matter of law, to the judgment sought by its motion. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).  Cross motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).   But where the cross motions overlap, the court may address the legal arguments together. *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.    The Shields' Motion for Partial Summary Judgment

The Shields ask the court to grant summary judgment in their favor on their counterclaim for patent infringement (Count I). Doc. 188 at 1. The Shields also ask the court to grant summary judgment against Neonatal on its claim seeking a declaratory judgment that Neonatal has not infringed the '498 Patent. *Id.* at 1–2. In moving for summary judgment on these two claims, the Shields concede that the court already has decided these claims in its ruling on Neonatal's Motion for Partial Summary Judgment. Namely, on August 24, 2017, the court granted Neonatal's Motion for Partial Summary Judgment. Doc. 180. This Order granted summary judgment for Neonatal on its declaratory judgment claim and entered a declaratory judgment that Neonatal has not infringed the '498 Patent. *Id.* at 45. The court also granted summary judgment against the Shields' counterclaims for patent infringement (Count I). *Id.*

Despite this ruling, the Shields assert that the court has broad discretion to reconsider a summary judgment ruling. And they urge the court to revisit its summary judgment ruling finding that Neonatal has not infringed the '498 Patent. As support, the Shields make an argument they never presented when the parties briefed Neonatal's Motion for Partial Summary Judgment. The Shields assert that the doctrine of estoppel precludes Neonatal from asserting that its PENGUIN® milk warmers are not covered by the '498 Patent because Neonatal marked its products with the patent's number. By marking its product in this fashion, the Shields argue, Neonatal deterred competition and enticed customers to purchase its PENGUIN® products. Thus, the Shields contend, the interests of equity require the court to revisit its ruling of non-

infringement and conclude, instead, that the doctrine of patent marking estoppel precludes Neonatal from arguing that the '498 Patent does not cover the accused devices.

Neonatal responds with two arguments. First, Neonatal asserts that the Shields' estoppel argument is improper procedurally. It asserts that the Shields never made this argument in their response to Neonatal's Motion for Partial Summary Judgment on the infringement claims. And so, Neonatal contends, the Shields cannot raise the argument now by labelling it a motion for summary judgment because, in effect, it asks the court to reconsider its earlier summary judgment ruling. Second, Neonatal argues that even if the court considers the Shields' patent marking estoppel argument on its merits, summary judgment against the Shields' infringement claim still is the right result. The court agrees with both of Neonatal's arguments. It explains why in the next two sections.

### A. The Shields' Estoppel Argument is Improper Procedurally.

Neonatal asserts that it is aware of no authority permitting a party to move for summary judgment on an issue after the court already has entered summary judgment against the party on the same issue. The court doesn't know of any such authority either. Nevertheless, even if the Shields' position makes a unique argument, the court recognizes that "it is well within the court's discretion to revise an interlocutory order at any time prior to the entry of final judgment." *Ferluga v. Eickoff*, 236 F.R.D. 546, 549 (D. Kan. 2006) (citations omitted). Thus, our court treats motions that ask it to revise dispositive orders decided before the court has entered judgment as motions for reconsideration under D. Kan. Rule 7.3. *Id.* (treating a motion to alter or amend a dispositive but non-final order as a motion for reconsideration under D. Kan. Rule 7.3).

D. Kan. Rule 7.3 requires a movant to file a motion seeking reconsideration within 14 days after the order is filed.  D. Kan. Rule 7.3(b).  The court issued its earlier summary judgment ruling on August 24, 2017.  Doc. 180.  But the Shields didn't file their Motion for Partial Summary Judgment—one that, in essence, seeks reconsideration of the earlier summary judgment ruling—until October 6, 2017.[3]  Thus, their request for reconsideration is untimely under the court's local rule.

Also, D. Kan. Rule 7.3 requires a movant to base a motion for reconsideration on:  "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error to prevent manifest injustice."  D. Kan. Rule 7.3(b); *see also Ferluga*, 236 F.R.D. at 549 (applying D. Kan. Rule 7.3(b) to a dispositive order and noting that the rule's requirements "are essentially identical" to Fed. R. Civ. P. 59(e) (citing *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).  So, "a motion for reconsideration is appropriate [only] where the court has misapprehended the facts, a party's position, or the controlling law." *Ferluga*, 236 F.R.D. at 549 (citing *Servants of Paraclete*, 204 F.3d at 1012).  Such a motion "is not [an] appropriate [device] to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Id.* (citing *Servants of Paraclete*, 204 F.3d at 1012).

The Shields satisfy none of the three prerequisites reconsidering an earlier summary judgment ruling.  First, they never cite an intervening change in controlling law.  To the contrary, the Shields' Memorandum in Support of their Motion for Partial Summary Judgment cites cases

---

[3]    The Shields assert that the court cannot convert their Motion for Partial Summary Judgment into a Motion for Reconsideration.  And they criticize Neonatal for citing no legal authority supporting such a conversion.  The court's own research likewise has revealed no cases where a court has treated a summary judgment motion as a motion for reconsideration.  But the procedural facts here are unique or— as Neonatal suggests—at least unorthodox.  The Shields have moved for summary judgment on an issue that the court already has decided.  Although styled as a Motion for Partial Summary Judgment, the motion asks the court to reconsider its earlier summary judgment ruling.  The court thus treats the motion as a Motion for Reconsideration.  And the court applies D. Kan. Rule 7.3(b) to this motion consistent with our court's precedent.

decided years before the court issued its August 24, 2017 Memorandum and Order.  Second, the Shields never assert that new evidence is available now to support their summary judgment arguments.  To the contrary, Neonatal demonstrates that the Shields knew about the facts supporting their motion—namely, that Neonatal marked its PENGUIN® machines with the '498 Patent's number—before the court issued its August 24, 2017 Memorandum and Order deciding Neonatal's Motion for Partial Summary Judgment.  Doc. 195 at 12.  Finally, the Shields never argue that a need to correct clear error or prevent manifest injustice requires the court to reconsider its earlier ruling.

Also, the Shields never explain why they didn't raise their patent marking estoppel argument in their earlier, timely response to Neonatal's Motion for Partial Summary Judgment.  They also never explain why they didn't file their current motion at the same time Neonatal filed its Motion for Partial Summary Judgment.  The Shields' arguments are ones that "could have been raised in prior briefing," and "[i]t is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing" in a motion for reconsideration. *Ferluga*, 236 F.R.D. at 549 (citing *Servants of Paraclete*, 204 F.3d at 1012).  Indeed, the Shields' Reply specifically recites that they "do not deny that their motion asks the Court to revisit a previous issue."  Doc. 203 at 4.  It is not appropriate for the Shields to ask the court to revisit an issue to address arguments that they could have made in a timely and more efficient manner.  The court thus rejects the Shields' efforts to seek reconsideration of the court's earlier summary judgment ruling.  It is improper.

For all these reasons, the Shields have failed to show that reconsideration of the court's earlier summary judgment ruling is timely or warranted under D. Kan. Rule 7.3.  The court thus

declines to reconsider its summary judgment ruling from its August 24, 2017 Memorandum and Order (Doc. 180).

### B. The Court Need Not Revise its Earlier Summary Judgment Ruling Based on the Patent Marking Estoppel Doctrine.

Even if the Shields timely presented their argument, it provides no reason for the court to revise its earlier summary judgment ruling. This court reaches this conclusion for two basic reasons.

First, the Federal Circuit explicitly refused to adopt the doctrine of patent marking estoppel in *Frolow v. Wilson Sporting Goods Co.*, 710 F.3d 1303, 1309 (Fed. Cir. 2013). The Federal Circuit began by recognizing that some circuits have endorsed "the doctrine of 'marking estoppel'" where "'a party that marks its product with a patent number is estopped from asserting that the product is not covered by the patent.'" *Id.* at 1308–09 (quoting *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 890 n.9 (Fed. Cir. 1988)). But the Federal Circuit noted that "the Supreme Court has never adopted or approved the doctrine." *Id.* at 1308. And it recognized that Congress has enacted legislation that provides a remedy for false marking. *Id.* (citing False Marking Statute, 35 U.S.C. § 292). The Federal Circuit thus "declin[ed] to create a separate, equitable doctrine unique to patent law, where Congress has spoken and standard evidentiary practices provide adequate remedy." *Id.* The Federal Circuit reasoned that "[e]quity should not rush in where an adequate remedy at law exists." *Id.* In sum, the Federal Circuit's holding in *Frolow* means that the Shields cannot prevail on an argument that Neonatal is estopped from asserting non-infringement, as a matter of law, because it marked its PENGUIN® products with the '498 Patent's number.

Second, the fact that Neonatal marked its PENGUIN® products with the '498 Patent's number does create a genuine issue requiring the court to revisit its summary judgment ruling of

16

noninfringement. While *Frolow* refused to adopt the patent marking estoppel doctrine, it also concluded that "evidence of marking is circumstantial evidence that the marked product falls within the patent claims and can preclude summary judgment in appropriate cases." *Id.* at 1310. The Federal Circuit explained that "[t]he practice of marking a product with a patent number is a form of extrajudicial admission that the product falls within the patent claims." *Id.* at 1309. "Generally, extrajudicial admissions of facts, such as patent marking, are simply evidence that may be countered by the party that made the admission." *Id.* "These admissions are not 'binding,' and 'may be controverted or explained by the party' that made the statement." *Id.* (citations omitted). So, "[a] defendant, of course, is free to introduce counter evidence or explanation." *Id.* at 1310. And, "whether a party's marking, in view of the record as a whole, raises a genuine issue of material fact, will depend on the facts of each case." *Id.* In short, patent marking does not preclude summary judgment against an infringement claim.

Specifically, in *Frolow*, the Federal Circuit reversed the district court's order granting summary judgment ruling that certain tennis rackets did not fall within the scope of a patent. *Id.* at 1310–11. The Federal Circuit held that the district court had erred by concluding that the defendant's patent marking "had no bearing" on the question whether the accused devices fell within a patent's scope. *Id.* at 1310. Instead, and as already discussed, the Federal Circuit held that evidence of marking "is circumstantial evidence that the marked product falls within the patent claims." *Id.* The Federal Circuit found that the summary judgment evidence "point[ed] in both directions"—the expert reports tended to show that the tennis rackets did not fall within the patent's scope while the marking evidence tended to show that the tennis rackets came within the patent claims. *Id.* at 1310–11. The Federal Circuit thus concluded that it was "the job of the

fact-finder—not the court at summary judgment—to weigh that evidence and render a decision." *Id.* at 1310.

The facts here differ from *Frolow* in many respects. *First*, unlike the district court in *Frolow*, the court's ruling here did not refuse to consider marking evidence on summary judgment. Instead, the Shields never presented that evidence for the court to consider.

*Second*, and in response to the marking evidence now presented, Neonatal has come forward with an explanation for the patent marking to address the Shields' contention that this evidence serves as an admission to preclude summary judgment against the Shields' infringement claim. After MMG hired Drake Koch to design the PENGUIN® milk warmers, Ms. Shields talked extensively with him and worked with him "a lot." She testified that she did not want Mr. Koch to mess up the design. And she made a long list of things for him to do and not do as he designed the PENGUIN® warmers and THERMA-LINER™ bags. Because the inventor of the '498 Patent was involved in designing the PENGUIN® warmers, Neonatal asserts, it was reasonable for all parties to assume that the warmers fell within the scope of the '498 Patent. Neonatal asserts that it believed this was so for nearly six years—until three significant things happened: By mid-2013, Neonatal had determined that the '498 Patent did not cover its products, Mr. and Ms. Shields terminated the Exclusive License Agreement, and Neonatal stopped marking its products with the '498 Patent's number.

Neonatal asserts that these facts differ from *Frolow*, a case where the licensee of tennis rackets argued that it owed the patentee nothing for its sales of tennis rackets that were marked with the patent number at issue. In contrast here, it is undisputed that the Shields received royalty payments for the products sold before the Shields terminated the Exclusive License Agreement. Those products were marked with the '498 Patent's number. After the Shields

terminated the Exclusive License Agreement, Neonatal stopped marking the products with the patent's number because it had concluded that the '498 Patent did not cover its products. *Cf. id.* at 1310 ("[I]f it is beyond dispute that the accused product was mis-marked, summary judgment will be appropriate."). So, unlike *Frolow*, the patent holder here received royalty payments for all products marked with the '498 Patent's number.

*Finally*, the evidence in *Frolow* "point[ed] in both directions," and thus, the Federal Circuit held, precluded summary judgment. *Id.* at 1310–11. The Federal Circuit recognized that a fact finder must weigh the marking evidence against expert testimony that the accused products did not come within the patent's scope. *Id.* In contrast here, the court already has concluded, as a matter of law, that the accused products do not meet three required limitations of each disputed claim: (1) "heater block," (2) "removable reservoir," and (3) the "void" or "well" formed in the heater block. Doc. 180 at 27–34. Applying the '498 Patent's claims to the structures of the accused device, the court concluded that no reasonable jury could find that every limitation recited in the '498 Patent is found in the PENGUIN® warmers. *Id.* Viewing the record as a whole, the circumstantial evidence of patent marking is insufficient to raise a genuine issue of fact of infringement when the court already has determined that the accused products do not meet three required limitations of each disputed claim of the '498 Patent. *See, e.g.*, *High Frequency Prods., Inc. v. Wynn's Climate Sys., Inc.*, 91 F.3d 167, 1996 WL 217840, at *2 (Fed. Cir. Apr. 30, 1996) (unpublished table opinion) (affirming summary judgment against an infringement claim because, even though the seller mistakenly had marked the products with the patent number on them, it was undisputed that the patent claims did not cover the accused device and thus no actual infringement had occurred). *Cf. SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 890 (Fed. Cir. 1988) (where the patentee had admitted that the product did

not infringe the patent, the court did "not accept the proposition that *an admittedly non-infringing* product can be converted by [marking] estoppel to an infringing product").

The Shields have presented no substantial reason for the court to revisit its August 24, 2017 Memorandum and Order granting:  (1) summary judgment for Neonatal on its declaratory judgment claim that Neonatal has not infringed the '498 Patent; and (2) summary judgment against the Shields' Counterclaim for patent infringement (Count I).  The court thus denies the Shields' Motion for Partial Summary Judgment (Doc. 188).

### IV.    Neonatal's Motion for Summary Judgment on Remaining Counterclaims

This ruling leaves Neonatal's Motion for Summary Judgment on Remaining Counterclaims.  Doc. 185.  Neonatal seeks summary judgment against the Shields' three remaining counterclaims:  (1) breach of a Patent Marketing Agreement (Count IV); (2) breach of fiduciary duty (Count VI); and (3) intentionally causing or assisting an agent to violate the duty of loyalty (Count VII).  The court addresses each claim, in turn, below.

### A.  Breach of the Patent Marketing Agreement (Count IV)

The Shields accuse defendants MMG and Scott Norman of breaching of the Patent Marketing Agreement.  Doc. 143 at 18, 20, 23 (Pretrial Order ¶¶ 3.b.29., 4.c.4., 5.b.18–19.).  Neonatal asserts that the court should grant summary judgment against the Shields' counterclaim for breach of the Patent Marketing Agreement for two reasons.  First, Neonatal contends, the summary judgment facts establish that MMG and Mr. Norman never committed any material breaches of the Patent Marketing Agreement.  Instead, Neonatal argues, MMG and Mr. Norman substantially performed their obligations under the Patent Marketing Agreement.  And thus, Neonatal asserts, no reasonable jury could find against them on a claim for breaching that Agreement.  Second, even if the undisputed facts create a genuine issue whether a material

breach occurred, Neonatal argues that the Shields' claim still fails as a matter of law because they never incurred damages from that breach. The court considers these two arguments, in separate sections, below.

### 1. Do the Summary Judgment Facts Create a Genuine Issue Whether MMG and Mr. Norman Breached the Patent Marketing Agreement?

In Kansas,[4] a breach of contract claim requires: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (citations omitted).

Neonatal asserts that no reasonable jury could conclude from the summary judgment facts that the Shields could establish the fourth element of a breach of contract claim—that MMG and Mr. Norman breached the Patent Marketing Agreement. A breach of contract is a "material failure to perform a duty arising under or imposed by agreement . . . ." *David v. Hett*, 270 P.3d 1102, 1109 (Kan. 2011); *see also Pancake House, Inc. v. Redmond By & Through Redmond*, 716 P.2d 575, 578 (Kan. 1986); *Dexter v. Brake*, 269 P.3d 846, 856 (Kan. Ct. App. 2012) ("A material breach is one in which the promisee receives something substantially less or different than he or she bargained for.").

Kansas recognizes and applies the rule of "substantial performance" to contract disputes. *Howarth v. Olivier*, 52 P.3d 911, 914 (Kan. 2002) (citing *Almena State Bank v. Enfield*, 954 P.2d 724, 727 (Kan. Ct. App. 1998)). Under this doctrine, a party need not perform "in exact correspondence with the contracted obligation." *Almena State Bank*, 954 P.2d at 727 (citation

---

[4]    The Shields' counterclaim for breach of the Patent Marketing Agreement is governed by Kansas law under the doctrine of lex loci contractus. Doc. 143 at 2 (Pretrial Order ¶ 1.d.).

and internal quotation marks omitted).  Instead, in Kansas, "the doctrine of substantial performance" considers a party's performance as complete when "the essential purpose of the contract is accomplished and that party has made a good-faith attempt to comply with the terms of the agreement, even though he or she fails to meet the precise terms of the agreement." *Dexter*, 269 P.3d at 856.  The doctrine's purpose is "'intended to protect the right to compensation of those who have performed in all material and substantive particulars . . . .'" *Id.* (quoting 15 Williston on Contracts § 44:52, at 220–21 (4th ed. 2000)).

"Substantial performance is the antithesis of material breach.  If it is determined that a breach is material, it follows that substantial performance has not been rendered." *Almena State Bank*, 954 P.2d at 727 (citation and internal quotation marks omitted).  "Substantial performance is shown when the following circumstances are established by the evidence:  (1) The party made an honest endeavor in good faith to perform its part of the contract; (2) the results of the endeavor are beneficial to the other party; and (3) such benefits are retained by the other party." *Howarth*, 52 P.3d at 914 (citing *Almena State Bank*, 954 P.2d at 727).

Here, Neonatal argues that the Shields assert only technical breaches of the Patent Marketing Agreement—not material breaches—and thus their breach of contract claim fails as a matter of law.  Specifically, Neonatal contends that the "essential purposes" of the Patent Marketing Agreement were:  (1) to procure a license of the '498 Patent for the Shields, and (2) to collect and distribute royalty payments after the Shields entered a license agreement.  Neonatal asserts that the parties accomplished these two purposes.  First, it is undisputed that MMG found the Shields a licensee—Neonatal.  This purpose was accomplished when the parties executed the Exclusive License Agreement.  And second, it is undisputed that MMG received and distributed royalties it received from Neonatal to the Shields.

The Shields disagree with Neonatal's characterization of the Patent Marketing Agreement's essential purposes. They contend that MMG and Mr. Norman committed material breaches of the Patent Marketing Agreement because they never performed certain marketing consulting services that the contract required them to perform "throughout the term of the agreement"—not just until the Exclusive License Agreement was signed. *See* Doc. 194-2 at 1 (Patent Marketing Agreement § 3 ("'MMG' Obligations. Throughout the term of this Agreement, 'MMG' shall . . . .")). Ms. Shields testified that MMG breached the Patent Marketing Agreement by: (1) failing to develop a database of qualified licensees as the Patent Marketing Agreement's section 3(a) requires; (2) never preparing a product prospectus as section 3(h) requires; (3) failing to prepare a financial pro forma as section 3(i) requires; (4) never producing a media kit as section 3(j) requires; and (5) never developing a webpage for the products as section 3(k) requires. Ms. Shields also testified that MMG breached section 3(n) of the Patent Marketing Agreement. That section required MMG to collect and distribute royalties due within 3 days. But, because an audit revealed that Neonatal had underpaid Mr. and Ms. Shields by $703.42 between 2010 and 2012, the Shields contend that MMG failed its obligation to collect royalties due to them.

Viewing the facts in the light most favorable to the Shields, the court cannot conclude that these alleged breaches of the Patent Marketing Agreement are merely technical or inadvertent ones. Thus, summary judgment against the breach of contract claim is unwarranted. Indeed, Kansas defines "substantial performance" as "a relative term, and whether it exists is a question to be determined in each case with reference to the existing facts and circumstances." *Howarth*, 52 P.3d at 914. And "the question whether substantial performance has taken place is a question of fact." *Almena State Bank*, 954 P.2d at 727.

Here, the parties dispute the Patent Marketing Agreement's essential purposes. Neonatal asserts that the purpose was to find a licensee and collect royalties—two purposes that the contract accomplished. The Shields assert that the Patent Marketing Agreement required MMG to render certain marketing consulting services that it never completed. They have come forward with admissible evidence to support the existence of these obligations, *i.e.*, the Patent Marketing Agreement itself. Given this conclusion, the court cannot find, as a matter of law, that MMG accomplished all the essential purposes of the parties' Agreement. Instead, the jury must decide the factual question whether the alleged breaches of the Patent Marketing Agreement were material ones. *See id.* at 728 (concluding that "the trial court should not have resolved [whether substantial performance had occurred] on a motion for summary judgment" because, although the summary judgment facts showed some performance under the contract, "[w]hether this was substantial performance is a disputed question of fact not determinable on a motion for summary judgment."); *see also Firestone v. Hawker Beechcraft Int'l Serv. Co.*, No. 10-1404-JWL, 2012 WL 683286, at *12 (D. Kan. Mar. 2, 2012) (concluding that a jury must "determine whether the alleged breaches are material." (first citing E. Allan Farnsworth, Contracts § 8.16, at 638 (2d ed. 1990); then citing *Almena State Bank*, 954 P.2d at 727)).

The court thus rejects Neonatal's first argument supporting its summary judgment motion. Because the summary judgment facts present a triable issue whether MMG and Mr. Norman committed material breaches of the Patent Marketing Agreement, the court denies summary judgment against this claim on this basis.

## 2. Do the Summary Judgment Facts Create a Genuine Issue Whether the Shields Sustained Damage from a Breach of the Patent Marketing Agreement?

The court also rejects the second basis advanced by Neonatal to support its summary judgment motion. Neonatal asserts that the Shields have no admissible evidence showing that they sustained damage from any alleged breach of the Patent Marketing Agreement. Neonatal contends that the only damages that the Shields could recover from a breach of the Patent Marketing Agreement is unpaid royalty payments. But the summary judgment facts establish that the Shields have received all royalty payments owed to them—including the $703.42 that Neonatal underpaid the Shields between 2010 and 2012. Neonatal asserts that the Shields were paid all royalty payments owed, and thus they can recover no other damages for breach of the Patent Marketing Agreement.

The Shields respond that Kansas law entitles them to recover at least nominal damages for a breach of contract. The court agrees. *See Freeto Constr. Co. v. Am. Hoist & Derrick Co.*, 457 P.2d 1, 5–6 (Kan. 1969) (explaining that a claimant asserting a breach of contract is entitled to recover nominal damages even if no actual damage resulted from the breach); *see also Wolfert Landscaping Co., L.L.C. v. LRM Indus., Inc.*, 287 P.3d 300, 2012 WL 5392143, at *5 (Kan. Ct. App. Nov. 2, 2012) (unpublished table opinion) ("As a general rule, when a party establishes a material breach of contract it is entitled to nominal damages at a minimum."). So, even if the Shields cannot prove actual damages from a breach of the Patent Marketing Agreement, Kansas law still permits their contract claim to survive summary judgment because they could recover a nominal damage award if they establish a material breach.[5]

---

[5]    The court recognizes that the Shields may not wish to incur the cost of trying a claim where, at most, they could recover nominal damages. But Kansas law does not allow the court to consider that pragmatic dynamic when deciding a summary judgment motion.

The court thus denies summary judgment against the Shields' counterclaim for breach of the Patent Marketing Agreement.

### B. Breach of Fiduciary Duty (Count VI) and Intentionally Causing or Assisting an Agent to Violate the Duty of Loyalty (Count VII)

Neonatal also seeks summary judgment against the Shields' counterclaims for breach of fiduciary duty and for intentionally causing or assisting an agent to violate the agent's duty of loyalty. Neonatal asserts that the Shields have adduced no admissible evidence that it breached its fiduciary duty or the duty of loyalty.[6] The court agrees with Neonatal.

The Shields accuse MMG and Mr. Norman of breaching fiduciary duties owed to them under the parties' contracts. Doc. 143 at 24 (Pretrial Order ¶ 5.b.23–25.). The Shields also accuse Neonatal and Mr. Norman of causing or assisting MMG to breach its fiduciary duty arising from the contracts. Doc. 143 at 24 (Pretrial Order ¶ 5.b.26–29.). But the undisputed summary judgment facts, even when viewed in the Shields' favor, establish no genuine issue whether either MMG or Mr. Norman breached any fiduciary duty owed to the Shields.

To survive summary judgment against a breach of fiduciary duty claim under Kansas law, the summary judgment facts must present a triable issue that: (1) a fiduciary relationship existed between MMG or Mr. Norman and the Shields; (2) MMG and Mr. Norman owed a duty to the Shields based on the fiduciary relationship; and (3) MMG or Mr. Norman breached that duty. *Cargill Meat Sols. Corp. v. Premium Beef Feeders, LLC*, 168 F. Supp. 3d 1334, 1339 (D. Kan. 2016) (citing *Peterson ex rel. Peterson v. Cmty. Living Opportunities, Inc.*, 197 P.3d 905, 2008 WL 5401456, at *3 (Kan. Ct. App. Dec. 19, 2008) (unpublished table opinion)).

The Shields contend that MMG and Mr. Norman breached the fiduciary duties owed to them by: (1) knowingly participating in the breach of the Exclusive License Agreement as

---

[6]    These two counterclaims are governed by Kansas law under the doctrine of lex loci delecti. Doc. 143 at 2 (Pretrial Order ¶ 1.d.).

agents for the Shields; and (2) knowingly participating in the breach of the Patent Marketing

Agreement.  Doc. 143 at 18 (Pretrial Order ¶ 3.b.29.).[7]  Both the Patent Marketing Agreement

and the Exclusive License Agreement provided that MMG was an "independent contractor."

Doc. 24-1 at 2 (Patent Marketing Agreement § 3(d) ("'MMG' shall act as an independent

contractor and be solely responsible and bear all expenses incurred as a result of 'MMG's' office

facilities and business activities generally.")); Doc. 122-1 at 8 (Exclusive License Agreement §

10.10.01 ("The parties hereby acknowledge and agree that each is an independent contractor and

that neither party shall be considered representative, master or servant of the other party for any

purpose whatsoever . . . Nothing in this relationship shall be construed to create a relationship of

joint venture, partnership fiduciary, or other similar relationship between the parties.").  But the

Exclusive License Agreement also designated MMG as "agent of [Mr. and Ms. Shields] to

receive all royalty payments, consulting fees, commitment fees, and reports" on the Shields'

behalf.  Doc. 122-1 at 3 (Exclusive License Agreement § 7.01.0).

Kansas recognizes two types of fiduciary relationships:  "those created by contract and

those implied in law from the surrounding facts and the relationship of the parties."  *Daniels v.

Army Nat'l Bank*, 822 P.2d 39, 42 (Kan. 1991).  Here, Neonatal asserts that the only fiduciary

relationship between the parties arose from a contract—the agency relationship created by the

Exclusive License Agreement.  The Shields never challenge this assertion.  Also, they never

---

[7]        Section 3.b.29. of the Pretrial Order also asserts that MMG and Mr. Norman breached their
fiduciary duties when they knowingly participated in infringing the '498 Patent and knowingly
misappropriated assets in the form of royalty payments owed to the Shields under the Exclusive License
Agreement.  The court already has concluded, as a matter of law, that Neonatal never infringed the '498
Patent.  So, MMG and Mr. Norman never participated in the purported infringement that the Shields rely
on for their fiduciary duty claim.  Also, the Shields have adduced no admissible evidence to support their
contention that MMG and Mr. Norman knowingly misappropriated assets in the form of royalty
payments.  To the contrary, the summary judgment facts establish that Neonatal—not MMG or Mr.
Norman—underpaid the Shields by $703.42 for royalty payments.  The summary judgment facts also
establish that Neonatal reimbursed the Shields by that amount after a royalty audit revealed this
underpayment.

argue that a fiduciary relationship arose in some other fashion—whether from some other

contract or set of surrounding facts.  And the Shields provide no facts from which the court could

imply that a fiduciary duty existed based on the relationship of the parties.

So, on this record, the court considers whether MMG breached fiduciary duties created

by the Exclusive License Agreement—which made MMG an "agent of [Mr. and Ms. Shields] to

receive all royalty payments, consulting fees, commitment fees, and reports" on the Shields'

behalf.  Doc. 122-1 at 3 (Exclusive License Agreement § 7.01.0).  An agent owes a fiduciary

duty to its principal—one that "demand[s] trust and confidence" and imposes an "obligation of

individual service and loyalty."  *Henderson v. Hassur*, 594 P.2d 650, 658 (Kan. 1979) (citation

omitted).  So, "[i]n all business transactions affecting the subject matter of an agency, it is the

duty of the agent to act in good faith and with loyalty to further advance the interests of the

principal."  *Id.* (citations omitted).  In other words, an agent is "a fiduciary with respect to

matters within the scope of [the] agency."  *Arst v. Stifel, Nicolaus & Co. Inc.*, 86 F.3d 973, 978

(10th Cir. 1996) (applying Kansas law and citing Restatement (Second) of Agency § 13 (1958)

(further citations omitted)).

Applying these rules, the Kansas Supreme Court has concluded that one who has agreed

to collect money for another acts as an agent and thus owes a fiduciary duty to the other party to

pay it the full amount owed.  *See Gillespie v. Martin, Pringle, Oliver, Wallace & Swartz*, 899

P.2d 478, 480, 482 (Kan. 1995) (concluding that the uncontroverted facts established a defendant

law firm owed a fiduciary duty to the plaintiff which the district court described as a "duty . . . to

pay to plaintiff the full amount of his proceeds to which he was entitled.").

Here, the summary judgment facts present no genuine dispute whether MMG failed to

receive a royalty payment, consulting fee, commitment fee, or report on the Shields' behalf as

the Exclusive License Agreement required MMG to do as the Shields' agent.  In contrast, the

summary judgment facts establish that an audit of royalty payments for 2010 through 2012

revealed that *Neonatal* had underpaid Mr. and Ms. Shields by $703.42 over that three-year

period.  But nothing in the summary judgment record suggests that Neonatal had attempted to

pay that amount to MMG but that MMG failed to receive the royalty payment.  Likewise, the

summary judgment facts establish that Neonatal reimbursed Mr. and Ms. Shields for the

underpayment, thus fully compensating the Shields.  None of the summary judgment facts show

that *MMG* breached a fiduciary obligation it owed the Shields as their agent.

The Shields respond, asserting that "MMG breached its fiduciary duties to the Shields

when it steered them towards a licensee that was affiliated with MMG and then convinced the

Shields to enter into a one-sided license agreement."[8]  Doc. 207 at 17.  But the Shields never

explain how this alleged conduct could breach a fiduciary duty owed by MMG.  Instead, MMG's

fiduciary duty arises from its agreement to serve as an agent for the Shields under the Exclusive

License Agreement.  And, as explained, the summary judgment facts never establish that MMG

breached any duties imposed by that Agreement, *i.e.*, to receive royalty payments, consulting

fees, commitment fees, and reports on the Shields' behalf.

---

[8]        The Shields never argue that MMG and Mr. Norman breached their fiduciary duties by
knowingly participating in a breach of certain provisions of the Patent Marketing Agreement—*e.g.* the
obligations to develop a database of qualified licensees, prepare a product prospectus, prepare a financial
pro forma, produce a media kit, or develop a webpage.  Even if they had made such an argument, the
duties would have arisen from a contract.  In other words, this duty would represent a contract duty not
capable of supporting  a separate claim for breach of fiduciary duty.  *See Underground Vaults & Storage,
Inc. v. Cintas Corp.*, 632 F. App'x 917, 924 (10th Cir. 2015) (recognizing that Kansas law does not allow
a party to recover tort remedies on contract-based claims unless "an independent tort—something
separate from the breach of contract" caused the harm); *see also Pipeline Prods., Inc. v. Horsepower
Entm't*, No. 15-4890-KHV, 2017 WL 4536420, at *3 (D. Kan. Oct. 11, 2017) (explaining that the
viability of a breach of fiduciary duty claim turns on whether the plaintiffs alleged the breach of a duty
"independent from defendants' contractual obligations").  *Cf. Burcham v. Unison Bancorp. Inc.*, 77 P.3d
130, 146 (Kan. 2003) (holding that the plaintiffs could plead both a contract claim and an independent tort
claim for breach of fiduciary duty because "the duties and liabilities [the] plaintiffs attempt[ed] to impose
were not those bargained for in the . . . [contract].  Nor were duties, such as a fiduciary duty, negated by
the contract").

Also, the summary judgment facts won't support the Shields' conclusory assertion about steering. Although the Shields contend that MMG "steered" them towards a licensee who was affiliated with MMG, the undisputed facts show that Neonatal was not formed until 2006—two years after the Shields and MMG entered the Patent Marketing Agreement. The Shields concede that Mr. Norman told the Shields that he would be involved in Neonatal's management in addition to his role at MMG *before* the parties signed the Exclusive License Agreement. Thus, Mr. Norman never violated any duty of disclosure he owed to the Shields. *Cf. Arst*, 86 F.3d at 979 (holding that the failure to disclose self-dealing constituted a breach of fiduciary duty under Kansas law).

In sum, the summary judgment facts viewed in the Shields' favor establish no triable issue whether MMG or Mr. Norman breached a fiduciary duty owed to the Shields. The court thus grants summary judgment against the Shields' counterclaims for breach of fiduciary duty (Count VI) and for intentionally causing or assisting an agent to violate the duty of loyalty (Count VII).

## V.    Conclusion

The court makes a final observation about this case. Although not relevant to the substantive legal issues addressed above, the Shields have argued that "this dispute reeks of inequity." Doc. 189 at 13. Ms. Shields developed a device, secured a patent for the device, and contracted with Neonatal to license her invention. Neonatal then sold a product marked with her patent number for several years. The Shields enjoyed royalties from those sales until Neonatal concluded the '498 Patent did not cover its product. Neonatal then stopped paying the Shields royalties and haled them into court to assert a noninfringement claim. The Shields assert that Neonatal's actions are unjust, and thus the court should revisit its summary judgment ruling on

noninfringement because equitable considerations favor letting a jury decide whether Neonatal's product infringes the '498 Patent.

The Shields' argument here is too little too late. The Shields never asserted a patent marking estoppel argument when the court considered Neonatal's Motion for Summary Judgment on the infringement claims. And now that the Shields have asserted the estoppel argument, they provide no explanation why they waited to assert the argument until the court already has decided that the accused devices do not infringe the '498 Patent. But, even if the Shields had presented their estoppel argument timely, the fact that Neonatal marked its products with the '498 Patent's number does not require the court to give the Shields the relief sought by their Motion for Partial Summary Judgment. The Shields ask the court to issue a new summary judgment ruling that reaches the opposite conclusion that its earlier Order reached, *i.e.*, a new ruling granting summary judgment for the Shields on their infringement claim and granting summary judgment against Neonatal's noninfringement claims. But the fact that Neonatal marked its products with the '498 Patent's number does not establish that the accused devices infringed the patent as a matter of law. To the contrary, as the court held in its earlier summary judgment Order, the undisputed facts in this case establish that the accused products do not meet three required limitations of each disputed claim of the '498 Patent. And the Shields' patent marking estoppel argument provides no reason to revisit that ruling.

Also, importantly, equitable considerations don't factor into the court's summary judgment decision in this case. The court understands why the Shields view the outcome of their infringement claim as an inequitable one. Frequently, parties who come out on the short end of the law feel that equity compels the opposite result. But Federal Rule of Civil Procedure 56 does not permit the court to set aside the undisputed summary judgment facts or the effect of the

31

governing law under those facts.  The court has applied Rule 56's summary judgment standard

both in this Order and its earlier summary judgment ruling.  And the Shields' equitable

arguments can't justify a different outcome.

So, for reasons explained above, the court denies the Shields' Motion for Partial

Summary Judgment.  Also, the court grants Neonatal's Motion for Summary Judgment on

Remaining Counterclaims in part but denies that motion in part as well.  Specifically, the court

enters summary judgment against the Shields' counterclaims for breach of fiduciary duty (Count

VI) and intentionally causing or assisting an agent to violate the duty of loyalty (Count VII).  The

court denies summary judgment against the Shields' counterclaim for breach of a Patent

Marketing Agreement (Count IV).

**IT IS THEREFORE ORDERED BY THE COURT THAT** Neonatal and the

Counterclaim Defendants' Motion for Summary Judgment on Remaining Counterclaims (Doc.

185) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** the Shields' Motion for Partial Summary

Judgment (Doc. 188) is denied.

**IT IS SO ORDERED.**

**Dated this 28th day of February, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**